**Opinion issued April 2, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00450-CR

————————————

**KEODDRICK DRESHON POLK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the Criminal District Court No. 1
Tarrant County, Texas[1]
Trial Court Case No. 1484618D**

---

## MEMORANDUM OPINION

---

[1]    The Texas Supreme Court transferred this appeal from the Court of Appeals for the Second District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals).

Keoddrick Dreshon Polk was convicted by a jury of the offense of capital murder for the shooting death of Breon Robinson.[2] The trial court sentenced Polk to life imprisonment without the possibility of parole. In two issues, Polk contends that the trial court abused its discretion by admitting hearsay evidence over his objections. We affirm.

## Background

The facts surrounding Robinson's shooting, the police investigation, and Polk's identification as the shooter are divided into two sections. First, we discuss the unobjected to evidence. Next, we discuss the evidence that is the basis of Polk's hearsay challenges and appeal.

### A. Unobjected to testimony and other evidence

Breon Robinson and his best friend, Jkeiston Levi, were driving to a Fort Worth mall around 7:00 p.m. one evening when Levi received a call from an acquaintance, Cedric Richardson, who was trying to sell a handgun. Robinson already owned a gun; it was in his lap when Richardson called. But Robinson decided that he wanted to buy Richardson's gun and that he had enough cash on hand to buy it immediately. The three agreed to meet at a nearby gas station.

---

[2] *See* TEX. PENAL CODE § 19.03(a)(2) (stating that person commits offense of capital murder if person intentionally commits murder in course of committing or attempting to commit, among other offenses, robbery).

2

Levi testified that he parked his silver Sebring alongside the gas pumps at the agreed-to gas station. While Robinson stayed in the front passenger seat, Levi got out and looked for Richardson. Levi saw Richardson walking toward him. Richardson had another young man with him, but Levi did not know that person. Levi got back into his driver's seat. Richardson sat in the backseat behind Robinson, and the man Levi did not yet know sat in the backseat behind Levi.

In the courtroom, Levi identified Polk as the man who sat behind him that evening. Levi described Polk sitting behind him and immediately demanding, "Give me y'all's s—!" while pointing a gun at Levi's head. Levi testified that he threw the cash he had toward the backseat. Polk turned the gun toward Robinson in the front passenger seat and shot the gun. Robinson was shot in the back and immediately started screaming. Robinson opened the front passenger door, ran from the Sebring while still holding his gun, and collapsed. His gun landed nearby.

Levi jumped out of the car and ran to Robinson. Polk collected the money that Levi had thrown, and then Polk ran over and picked up Robinson's dropped gun. Levi lifted Robinson and put him in the backseat of the Sebring. Polk helped Levi get Robinson into the backseat. Levi intended to drive Robinson to the hospital. He called 9–1–1 as he drove.

While Levi was driving to the hospital, he was shot multiple times by an occupant of a car that had overtaken him. Levi was shot in his arm, neck, face, hand,

and chest. Afterward, according to Levi, everything "just went black." He regained consciousness in an ambulance. He spent the next month in the hospital and required multiple surgeries for his wounds.

Levi testified that Polk shot Robinson at the gas station and shot him as he drove to the hospital. On cross-examination, Levi was asked about his memory of that night. Levi testified, "Well, I mean, the more I think about it, the more I remember." When pressed if his recollection might have been influenced by information he has been told since the shooting, Levi rejected the implication, stating about Polk, "He shot Breon [Robinson] and he shot me. . . . And he robbed us. . . . I knew that when I was in the hospital without nobody telling me."

The police officers who investigated the shooting also testified. Officer P. Hyder with the Fort Worth Police Department said that he was ending his patrol shift when he received a report of a shooting at the gas station. On his way to the gas station, he received a report of another shooting. Hyder changed course and went to the scene of the second call. There, he found Levi's Sebring pulled over a curb. Inside, Levi was slumped over the central console, unconscious, and bleeding badly. Robinson was lying unconscious in the backseat. Hyder applied a Halo Seal to Levi's chest to stop his blood loss. Hyder then checked on Robinson, but he was unable to detect a heartbeat. Levi was taken by ambulance to the hospital. Robinson was pronounced dead. Hyder and other officers investigated the scene around the

4

Sebring. Hyder suspected the gas station shooting was related to this shooting because the calls were so close in time and location.

Officer Loud was one of the officers who responded to the gas station crime scene. He received a call that gunshots had been fired at the gas station and arrived there a little after 7:00 p.m. Loud saw no indications of an active conflict, but he did find a pool of blood on the ground.

Detective J. Cedillo also went to the gas station that evening. He and Detective Martin determined that the gas station had surveillance cameras. They asked and were granted permission to watch the videos. The videos showed a Sebring park at the gas pump and a Jetta pull halfway into a handicapped parking space near the entrance just after 7:00 p.m. The videos also showed the two young men from the Jetta get into the backseat of the Sebring, the Sebring jerk slightly, all car doors open quickly, and then all four men run from the car as Robinson held his back. Detective Martin downloaded a copy of the videos for evidence.

Detective K. Sullivan watched the videos the next day. He easily read several digits on the Jetta's license plate. He entered the information into a police database and found a single match: a silver Jetta Volkswagen registered to J. Washington. Sullivan discovered that Washington had a teen son named Keoddrick Polk. Sullivan pulled a file photo of Polk and, he testified, "immediately recognized him as the person who was driving the vehicle that pulled into the parking lot" and parked in

5

the handicapped parking space. Sullivan confirmed that he was able to positively identify Polk by comparing the surveillance videos to the file photo, before any further investigation occurred. Detective Cedillo also testified that the surveillance videos matched the photo of Polk.

Sullivan was asked what he did next in his investigation. He testified that the same day he watched the videos and determined that Polk's photo matched, he went to Polk's mother's home address. There, he saw a silver Jetta parked one house down. Sullivan testified that the Jetta's license plate number matched the one seen in the gas station surveillance videos. Also, the Jetta had the same physical damage as the Jetta on the videos, including a damaged front bumper clip and a missing hubcap.

Detectives Cedillo, Sullivan, and M. Anderson visited Levi in the hospital about one week later. Anderson testified that his role was to administer a photo lineup. The detectives used a "blind photo spread" procedure, in which one detective selects photos of five individuals with similar characteristics as the suspect and places them on a photo spread along with a photo of the suspect, and then a second detective, who does not know which of the six in the photo spread is the suspect, shows the photo spread to the complainant for identification of the perpetrator. Detective Sullivan prepared the photo spread that contained Polk's photo. Anderson, without knowing which photo was Polk or whether Polk was accused of being the

6

shooter or the other person involved, showed the photos to Levi. Anderson testified that Levi identified Polk in the photo spread and stated that Polk was the person who shot him and Robinson. Detective Sullivan testified that Levi was confident in his identification.

P. Wertheim is a latent fingerprint examiner with the Fort Worth Police Department Crime Laboratory. He testified that he compared palm and fingerprints taken from Polk during trial to prints taken from the Sebring and determined that they were "made by the same person's" hand.

Detective Sullivan testified that he found a "fired PMC casing in the back floorboard of the Sebring that matched the same fired PMC casing" found inside the Jetta.

Thus, there was witness testimony, video evidence, and physical evidence linking Polk to Robinson's shooting. The police linked Polk to the Jetta driven to the scene where Robinson was shot by reading the license plate number from the videos and determining that the car belonged to Polk's mother. The Jetta at Polk's mother's house had damage that matched the damage seen in the videos. The police pulled photos of Polk and determined that they matched the person in the surveillance videos. Separately, Levi identified Polk as the shooter from his hospital bed one week after the shooting. Then, during his trial testimony, Levi again identified Polk

as the shooter. Moreover, prints taken from the side of Levi's car matched Polk's prints, and shell casings found in both cars also matched.

We turn now to the evidence that Polk challenges in this appeal.

**B.     Evidence Polk challenges as inadmissible hearsay**

In connection with Detective Sullivan's testimony about going to Washington's house and seeing the matching Jetta, Sullivan testified that he knocked on Washington's front door, and a person named M. Wallace answered. Sullivan was asked what information Wallace gave him. Polk objected that the question was improperly eliciting hearsay testimony. His objection was overruled. Sullivan then testified that Wallace said Polk would drive that Jetta.

The second challenged evidence relates to cell tower records. Detective Cedillo testified that he discovered a cell phone number linked to Polk. Through a search warrant, Cedillo obtained cell records from the cellular provider. Polk objected that the records were hearsay. His hearsay objection was overruled. Later, FBI Special Agent M. Sedwick testified that he interpreted the cell record data and determined when Polk's cell phone made contact with various cell towers in the area. Polk's phone connected to a cell tower near the gas station at 6:29 p.m. on the day of the shooting. Polk's phone connected to another cell tower in that same area ten minutes later, at 6:39 p.m. Sedwick explained that cell phones connect to cell towers

near their locations. Thus, Polk's phone was near the gas station about 30 minutes before Robinson was shot.

According to Sedwick, Polk's phone did not contact any cell towers from 6:39 p.m until just after midnight. Sedwick testified that the lack of any contact indicates that the phone was likely turned off or in airplane mode during those six hours. Sedwick testified that nonuse for that length of time was not characteristic of Polk's daily use habits, as evidenced by the call records he analyzed.

With this evidence in mind, we address whether Polk's denied hearsay objections on these two pieces of evidence support reversal of his capital murder conviction.

### Hearsay Objections

Polk contends that the trial court committed reversible error by denying his hearsay objections.

**A.    Standard of review**

The Texas Rules of Evidence define hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is generally inadmissible, but there are exceptions. *See, e.g.*, TEX. R. EVID. 802 (stating general inadmissibility rule), 803 (providing 24 categories of evidence that are excepted

9

from general rule), 804 (adding three additional exceptions for particular circumstances in which declarant is unavailable).

We review a trial court's decision to admit evidence for an abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Campos v. State*, 317 S.W.3d 768, 777 (Tex. App.—Houston [1st Dist.] 2010, pet ref'd). A trial court abuses its discretion when it acts without reference to guiding rules or principles or acts arbitrarily or unreasonably. *Galliford v. State*, 101 S.W.3d 600, 604 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). We will affirm the trial court's ruling if it lies within the zone of reasonable disagreement. *See Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). Moreover, "if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for [its] right ruling." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

The erroneous admission of a hearsay statement is non-constitutional error that is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(b); *Campos*, 317 S.W.3d at 779. Under Rule 44.2, any non-constitutional error, defect, irregularity, or variance that "does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b); *Infante v. State*, 404 S.W.3d 656, 663–64 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "A conviction should not be overturned for such error if this court, after examining the

record as a whole, has fair assurance that the error did not influence the trial court or had but a slight effect." *Campos*, 317 S.W.3d at 779 (citing *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001)).

In determining whether the jury's decision was adversely affected by non-constitutional error, an appellate court considers testimony, physical evidence, jury instructions, the State's theory and any defensive theory, closing arguments, and voir dire, if applicable. *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). Factors for consideration include "the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case," whether the State emphasized the error, and whether overwhelming evidence of guilt was present. *Id.* at 355–56.

## B.    Polk's arguments why evidence was inadmissible hearsay

Polk argues that Sullivan's testimony relaying Wallace's statement that Polk would drive the Jetta was inadmissible hearsay. The State argues that the statement was not offered for the truth of the matter asserted—that Polk drove the Jetta—but, instead, to explain what led the police to take the next steps in their investigation. *See Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) (extrajudicial statement offered for what was said rather than its truth is not hearsay). Polk counters that the police had identified Polk in the surveillance videos before they went to his mother's house and talked to Wallace; therefore, Wallace's statement did not impact

11

the police investigation's course. Instead, according to Polk, the State sought to admit Wallace's statement to prove that Polk drove the Jetta, making the statement inadmissible hearsay.

Regarding the objected-to cell phone records, Polk argues they were inadmissible hearsay because the custodian of records did not testify and the authenticating document attached to the records to bring them within the business-records exception was defective. *See* TEX. R. EVID. 803(6) (hearsay exception for records of regularly conducted activity), 902(10) (setting forth requirements for self-authenticating business records accompanied by affidavit). The State counters that the custodian's authenticating document need not meet the requirements of a business-records affidavit because it qualifies as an unsworn declaration under Section 132.001 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 132.001 (providing that unsworn declaration may be used in lieu of written sworn declaration or affidavit and setting forth required content of declaration); *see also Dominguez v. State*, 441 S.W.3d 652, 659 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (concluding that letter from T-Mobile employee accompanying cell tower records met requirements of Rule 803(6) and Section 132.001 to overcome hearsay challenge).

12

The State also argues that, even if the trial court erred in denying Polk's hearsay objections in these two instances, any error is not reversible given the significant other evidence of Polk's guilt. We agree.

## C.    Any error in admitting evidence was harmless

Polk challenges the trial court's rulings to admit two pieces of evidence in his capital murder trial: Sullivan's disclosure of what Wallace told him and the cell phone records. We may not reverse the trial court's judgment based on these evidentiary rulings—even if either or both constituted inadmissible hearsay—if the admission of the evidence did not harm Polk. *See* TEX. R. APP. P. 44.2(b); *Campos*, 317 S.W.3d at 779; *see Pickron v. State*, 515 S.W.3d 462, 466–67 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Polk was not harmed by the evidence for two reasons.

First, the evidence was cumulative. The import of the cell phone records was that they supported an inference that Polk was near the gas station at the time of the shooting and that his non-use of his phone for several hours after the shooting was outside his normal daily behavior. But other evidence admitted at trial strongly supported the conclusion that Polk was not only near the gas station 30 minutes before the shooting but, also, the person who sat in Levi's car and shot Robinson. Levi positively identified Polk as the shooter. The detectives positively identified Polk by comparing the surveillance videos to photos of Polk. The license plate and

13

the physical damage seen on the Jetta in the surveillance videos matched that of a Jetta registered to Polk's mother. Further, Polk's prints were recovered from Levi's car even though the two did not know each other before the day of the shooting.

The cell phone records placing Polk near the gas station were cumulative of this other evidence admitted without objection. *See Kennard v. State*, No. 01-16-00984-CR, 2017 WL 5623583, at *5 (Tex. App.—Houston [1st Dist.] Nov. 21, 2017, no pet.) (mem. op., not designated for publication) (concluding that any error in admitting cell phone records was harmless given, among other evidence, testimony from witnesses who saw appellant at scene); *Speers v. State*, No. 05-14-00179-CR, 2016 WL 929223, at *10 (Tex. App.—Dallas Mar. 10, 2016, no pet.) (mem. op., not designated for publication) (concluding that cell phone records were cumulative of testimony of trial witnesses and therefore their admission, if erroneous, was harmless).

Likewise, Wallace's statement to Detective Sullivan was cumulative of other evidence admitted without objection. The police had already watched the surveillance videos, determined that the Jetta in the videos belonged to Washington, determined that Washington was Polk's mother, and compared and matched the video images to photos of Polk. Polk is seen in the videos driving the Jetta. The detectives later saw the matching Jetta parked near Polk's mother's house with a matching license plate and matching body damage. Wallace's general statement that

14

Polk was known to drive the Jetta was cumulative of this other, unobjected-to evidence linking Polk to the Jetta at the time of the shooting. *See Diamond v. State*, 496 S.W.3d 124, 143 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding hearsay testimony harmless because testimony was cumulative of other evidence).

Second, the record as a whole contains overwhelming evidence of guilt independent of the objected-to evidence. Levi identified Polk as the shooter from his hospital bed and in court. Surveillance videos showed a Jetta matching one owned by Polk's mother at the gas station and a person identified as Polk getting out of the Jetta and into Levi's car immediately before Robinson was shot inside the car. And there was physical evidence placing Polk's print on Levi's car even though Levi testified he had never met Polk before the day of the shooting. Finally, the shell casings found in both cars matched.

The State's theory, summarized in closing argument, was that Polk set up the gun sale intending to rob Levi and Robinson. Polk ordered them to give him what they had, and he intentionally shot Robinson during the attempted robbery. After shooting Robinson, Polk picked up the money Levi threw into the backseat, and Polk took Robinson's gun. To avoid any witnesses against him, Polk then chased and shot Levi.

Polk did not testify. His defensive theory was centered on challenging whether the State proved the underlying offense of robbery as part of the capital murder

charge and arguing that the State had "overcharged" him. Thus, Polk's defensive theory was focused on the robbery aspect of the case, not his identification. But Polk does not challenge on appeal whether there was sufficient evidence to support the elements of capital murder or, more specifically, the underlying robbery offense. Instead, he challenges the hearsay rulings.

In light of the other strong evidence of guilt—including the surveillance videos, physical evidence, and Levi's identification of Polk as the shooter—we conclude that any error in admitting these two items of evidence is harmless. *See Pickron*, 515 S.W.3d at 466–67; *Thomas v. State*, No. 01-07-00742-CR, 2018 WL 4757018, at *3 (Tex. App.—Houston [1st Dist.] Oct. 30, 2008, pet. ref'd) (mem. op., not designated for publication) (concluding any error in admitting evidence was harmless given overwhelming evidence of appellant's guilt aside from complained-of evidence).

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Do not publish. TEX. R. APP. P. 47.2(b).

16