**Opinion issued June 10, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-01148-CR

————————————

**RODOLFO DOMINGUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 08DCR049886**

---

**O P I N I O N**

Rodolfo Dominguez was convicted by a Fort Bend County jury of capital murder[1] in the shooting death of his ex-girlfriend and her new boyfriend. He was sentenced by the trial court to life imprisonment without the possibility of parole.

---

[1]  TEX. PENAL CODE ANN. § 19.03 (West Supp. 2013) (defining capital murder).

Dominguez filed a motion for new trial, which was denied. Two of the issues raised in his denied motion challenged the trial court's evidentiary rulings. Dominguez asserts both issues again, here, arguing that the trial court erred in admitting (1) business records from T-Mobile linking Dominguez's use of his mobile phone on the night of the murders to cell towers located near his ex-girlfriend's place of work and, later, her boyfriend's house where the two were killed; and (2) white Dallas Cowboys Reebok shoes that the ex-girlfriend's daughter gave to Dominguez, which had a tread pattern visually similar to a partial shoe print observed at the crime scene.

We affirm.

## Background

Rodolfo Dominguez had an off-and-on romantic relationship with Norma Garcia for several years that ended in February 2008. Thereafter, Garcia began dating George Leal, who had been a friend and golf companion of Dominguez. One of Garcia's sisters, Nora Macias, testified that Garcia and Leal were actively attempting to hide their relationship from Dominguez, who would be "livid" if he found out about them. According to Leal's daughter, Garcia would hide her car in the garage when she was at Leal's home to keep the relationship a secret from Dominguez. Family members testified that it was customary for Leal to drive

Garcia home from work, even though Garcia owned her own car, because Garcia was afraid.

On the night of the murders, Garcia was working at La Placita restaurant with one of her other sisters, Nancy Hernandez. Around 9:00 p.m., Hernandez overheard a phone call Dominguez made to Garcia that was on speakerphone. According to Hernandez, Dominguez angrily said to Garcia: "You f— b—, you whore. You're going to pay for this." Hernandez immediately disconnected the phone and told her sister that she should not accept such abuse. Less than one hour later, Leal picked Garcia up from work. Hernandez talked to Garcia again around 11:00 that night, and Garcia told her sister that they were on their way to Leal's house for the evening.

The next day, on April 5, Leal's children found Garcia's and Leal's bodies in Leal's home. Garcia's body was lying in a pool of blood near the front door. Leal's body was near the back door. Both had been shot in the head. The Missouri City police department investigated. Officer A. Ceballos testified that it appeared that the door to Leal's home had been kicked in. He noticed a footprint, waist level, on the door near the deadbolt. Officer D. Avera also testified about the footprint and signs of forced entry. Leal's belongings in the home did not appear to have been disturbed. In fact, the police found $1,500 in cash in the home.

However, Officer Avera testified that the victims' wallets and mobile phones were never located.

During the investigation, Garcia's sister, Macias, told the police Dominguez had been sending unpleasant text messages to Garcia after their relationship ended, and as a result, Garcia had changed her phone number in an effort to avoid him. Based on the family's indication that Garcia and Dominguez's relationship was not good, the police interviewed Dominguez. He stated that he had spent the entire evening of April 4 at his family's bar, except for a brief outing to buy cigarettes. He also claimed that all of his telephone communications with Garcia were friendly.

In an effort to further investigate the phone calls and texts Dominguez made to Garcia before her death, the police requested phone data from the parties' mobile phone service providers, including T-Mobile. According to Detective S. Glave's review of the records, Dominguez called or texted Garcia 138 times in a 20-day period in March 2008, after the two had ended their relationship.

Detective Glave also testified about calls to and from Dominguez's phone on the night of the murders, April 4, as evidenced by the data received from T-Mobile. According to Glave, Dominguez made 13 calls between 9:00 p.m. and 3:00 a.m., spanning the time just before Garcia left work with Leal and through the likely time that the two were murdered. During the police investigation, Dominguez

admitted that he made these calls, although he claimed he had been at the bar during those times.

Detective Glave used data contained in T-Mobile's records to determine the location of the cell towers that were connected to Dominguez's phone when he used his mobile phone that evening. Detective Glave mapped the tower locations based on data received from T-Mobile and compared that information to the physical locations of La Placita restaurant where Leal picked up Garcia from work, Leal's home where the murders happened, and the bar where Dominguez claimed to have been that night. These three locations are many miles apart with multiple cell towers located between them.

According to Detective Glave's analysis, on the night of the murders, Dominguez's phone connected with cell towers near all three locations: around 9:00 p.m. his phone connected with a cell tower near the bar; around 10:00 p.m., which is when Garcia left work with Leal, Dominguez's phone connected to a tower near La Placita restaurant; the phone connected to a cell tower near the bar again around 11:15 p.m.; subsequently, it connected to a cell tower near Leal's home around 11:30 p.m.; then to a cell tower near Leal's home, again, just after midnight; finally, Dominguez's phone connected with cell towers near the bar between 12:30 a.m. and 3:00 a.m. Over Dominguez's objection, the phone records were admitted as evidence while Detective Glave testified.

Houston Police Department Officer M. Rone, who testified that he was assigned to the Communications Intelligence Division, was permitted to offer expert testimony—again, over Dominguez's objections—about his analysis of Dominguez's mobile phone records. Officer Rone testified about his training and experience interpreting phone records, and stated that experts in his field rely on cell tower data to determine which cell tower made a connection with a mobile phone at the beginning and ending of each call.

Officer Rone explained that a mobile phone will attempt to connect to the closest cell tower that is available to handle a phone call. The call can be passed on to other towers as the caller traverses an area during a phone conversation. The phone companies keep data specifying which tower was in contact with the mobile phone when the call began and when it ended. Officer Rone admitted that this data cannot tell the investigators precisely where the caller was located when he made his call. However, the phones are programmed to try to connect to the closest tower and, based on which tower was accessed, the phone can be said to be "within some proximity" to the tower to which it was connected. To explain the forced proximity of mobile phones and cell towers with which they connect, Officer Rone explained that a call made in Missouri City would not access a cell tower in downtown Houston. Instead, it would seek to connect to the closest tower, and if that tower was unavailable, it would try to connect to the next closest tower.

Officer Rone interpreted the T-Mobile records and testified that Dominguez repeatedly used his mobile phone in areas of town that were away from the bar where Dominguez claimed he was located that night. Instead, the records showed him close to La Placita near the time that Garcia left with Leal and close to Leal's home near the time that the murders occurred. The data contained in the phone records indicated to the police that Dominguez's alibi was invalid.

The other evidence linking Dominguez to the murder scene was a shoe print on the door of Leal's home. At first, the police analyzed a pair of boots belonging to Dominguez, but they did not match the print. It was not until the following year that the police came into possession of Dominguez's Dallas Cowboys Reebok shoes, which are white with the word "Cowboys" written on the side in blue print.

Dominguez had been living with Garcia's daughter, Estella, at the time of the murders. In the beginning of the police investigation, Estella told the police that Dominguez often wore a pair of Dallas Cowboys Reebok shoes that she had given him for Christmas four months earlier, but the police were unable to locate them. It was not until several months later that Estella found the shoes. She testified about the events leading up to their discovery.

According to Estella, several people, including Dominguez, planned to drive to San Antonio on the afternoon of April 5th—the day after the murders. When they packed for the trip, Dominguez put some of his belongings into her trunk.

Estella's husband testified that he saw Dominguez's shoes being placed in Estella's trunk on April 5th as they packed for their trip to San Antonio. Before they reached San Antonio, Estella received a phone call indicating there was something wrong, at which point they abandoned the trip and returned to Houston.

A couple months later, she found the Dallas Cowboys shoes still in her trunk. Realizing that the police were looking for the shoes that she had already described to them, she contacted the police department and informed them that she had found the shoes. Several months after that, the police retrieved the shoes from her.

According to a forensic scientist at the Texas Department of Public Safety Crime Lab, the herringbone pattern on the sole of the shoes Estella gave to the police was similar to the pattern left on Leal's door. Due to the poor quality of the photograph of the door, she was unable to determine whether there was an exact match between the photographed print and the shoes; her testimony was limited to the conclusion that the zigzag patterns on the door and on the sole of the shoes were "visually similar."

Dominguez objected at trial to the admissibility of the shoes, arguing that the chain of custody was inadequate, due to the length of time that passed between the date of the murders and the date the shoes were given to the police, as well as the multiple times the shoes changed location while still in Estella's possession,

8

including her change in residence. The trial court admitted the challenged evidence.

The jury found Dominguez guilty of capital murder. And the trial court sentenced him to life imprisonment without the possibility of parole. Dominguez filed a motion for new trial which was denied. He timely appealed, arguing that the trial court erred in admitting the phone records and the shoes into evidence.

**Standard of Review**

The standard of review for a trial court's admission or exclusion of evidence is abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Spradlin v. State*, 100 S.W.3d 372, 381 (Tex. App.—Houston [1st Dist.] 2002, no pet.). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). An abuse of discretion does not occur merely because the appellate court would have decided a discretionary matter in a different way than the trial court. *See id.*

A trial court must be given wide latitude in its decision to admit or exclude evidence. *Theus v. State,* 845 S.W.2d 874, 881 (Tex. Crim. App. 1992). As long as the trial court's evidentiary ruling is at least within the zone of reasonable disagreement, an appellate court may not disturb it. *Ellis v. State*, 99 S.W.3d 783, 788 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). There should be "reluctance

on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378; *Harris v. State*, 152 S.W.3d 786, 793 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd).

An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for doing so. *Owens-Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex. 1998); *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("We must uphold the trial court's evidentiary ruling if there is any legitimate basis for doing so, even if that ground was not raised below.").

### T-Mobile Business Records

In addition to pre-trial challenges to Officer Rone's expertise interpreting phone records, Dominguez argued that the T-Mobile records should be held inadmissible because the affidavit accompanying the cell tower records did not comply with Texas Rule of Evidence 902(10). Specifically, Dominguez complained that the T-Mobile document authenticating the cell tower records "does not indicate a seal or authentication of the office [of the person to whom the oath was given] on its face."

Properly authenticated records of regularly conducted business activity are admissible as an exception to the hearsay rule. TEX. R. EVID. 803(6) (business records exception). Rule 902(10) of the Texas Rules of Evidence provides a cost-

effective method of authenticating business records; it allows business records to be authenticated by an affidavit that substantially conforms to the model affidavit provided in the rule, rather than by live testimony. TEX. R. EVID. 902(10)(b). We need not determine whether the letter meets the requirements of an affidavit because this authenticating document meets the requirements of an alternative method of verification: an unsworn declaration.

Section 132.001 of the Texas Civil Practice and Remedies Code permits a party to use an unsworn declaration in lieu of an affidavit that is "required by statute or required by a rule, order, or requirement adopted as provided by law." TEX. CIV. PRAC. & REM. CODE ANN. § 132.001(a) (West Supp. 2013); *Tex. Dep't of Pub. Safety v. Carauna*, 363 S.W.3d 558, 564 (Tex. 2012) (noting that, by statute, unsworn declarations may be used in lieu of oaths or affidavits as long as they are subscribed as true "under penalty of perjury"). Before its 2011 amendment, the Texas unsworn declaration provision was available only to inmates; however, the statute was enlarged in 2011 to allow any person to satisfy a legal requirement of an affidavit with an unsworn declaration.[2] *Compare* TEX. CIV.

---

[2] The statute provides that an unsworn declaration cannot meet the requirement of an affidavit in limited circumstances, involving "a lien required to be filed with a county clerk, an instrument concerning real or personal property required to be filed with a county clerk, or an oath of office or an oath required to be taken before a specified official other than a notary public." TEX. CIV. PRAC. & REM. CODE ANN. § 132.001(b) (West Supp. 2013). However, none of those exceptions applies

11

PRAC. & REM. CODE ANN. §§ 132.001–.002 (Acts 1987, 70th Leg., ch. 1049 (enacted 1987)) *with* TEX. CIV. PRAC. & REM. CODE ANN. § 132.001 (Acts 2011, 82nd Leg., ch. 847, *amended by* Acts 2013, 83rd Leg., ch. 946. Courts have held that the provisions concerning unsworn declarations "apply in criminal as well as civil proceedings." *McMillan v. State*, 769 S.W.2d 675, 677 (Tex. App.—Dallas 1989, pet. ref'd) (citing *Owens v. State*, 763 S.W.2d 489, 491 (Tex. App.—Dallas 1988, pet. ref'd) (holding that unsworn declaration provision found in Civil Practice and Remedies Code applied to permit use of unsworn declaration in support of criminal defendant's motion for new trial)); *Ex parte Johnson*, 811 S.W.2d 93, 97 (Tex. Crim. App. 1991) (permitting use of unsworn declaration, as provided in Civil Practice and Remedies Code, to verify criminal defendant's statements in habeas corpus proceeding, noting legislative history, and stating that Civil Practice and Remedies Code provision on unsworn declarations is "an act relating to . . . the manner in which defendants are sentenced, confined, and released from confinement").

The change to the unsworn declaration statute to allow non-inmates to use unsworn declarations aligned Texas law with existing federal law. *See* 28 U.S.C.A. § 1746 (2003) ("Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or

to verification of business records, where an oath may be taken before a notary public. TEX. R. EVID. 902(10)(b).

permitted to be . . . proved by the sworn declaration . . . oath, or affidavit . . . such matter may, with like force and effect, be . . . proved by the unsworn declaration . . . of such person which is subscribed by him, as true under penalty of perjury . . . ."); *DIRECTV, Inc. v. Budden*, 420 F. 3d 521, 530 (5th Cir. 2005) (recognizing as "settled rule" that declarations satisfy affidavit requirement if made under penalty of perjury and verified as true and correct); *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 383 & n.1 (D. Md. 2010) (holding that unnotarized affidavit executed "under penalty of perjury" qualifies as unsworn declaration and summary judgment evidence).

The inclusion of the phrase "under penalty of perjury" is the key to allowing an unsworn declaration to replace an affidavit. *See Bahm v. State*, 219 S.W.3d 391, 393–94 (Tex. Crim. App. 2007) (applying prior version of statute that limited use of unsworn declarations to inmates); *Carauna*, 363 S.W.3d at 564 (stating that "[t]he verity of a declaration is thus assured by the criminal penalties for perjury."). "Thus, the inclusion of the phrase 'under penalty of perjury' is significant in itself, carrying serious legal consequences . . . ." *Bahm*, 219 S.W.3d at 394. Under Texas Penal Code section 37.02, a person who makes a false unsworn declaration commits a Class A misdemeanor. TEX. PENAL CODE ANN. § 37.02(b) (West 2011).

The letter from T-Mobile employee, Jonathan Mendillo, accompanying the cell tower records contains all of the declarations required to establish that the

records were prepared through T-Mobile's regularly conducted activities, as required by rule 803(6). TEX. R. EVID. 803(6) (business record exception). Mendillo states in the letter that he "certif[ies] on penalty of criminal punishment for false statement or false attestation" that his statements are true and accurate to the best of his knowledge and belief. The letter, therefore, constitutes an unsworn declaration under section 132.001 of the Civil Practice and Remedies Code, which is an alternative method of verification to Rule 902(10).

We conclude that the letter from Mendillo meets the statutory requirements of Rule 803(6) and section 132.001 of the Texas Civil Practice and Remedies Code to prevent the T-Mobile records from being excluded as hearsay. *See Carauna*, 363 S.W.3d at 564 (current version of law); *cf. Bahm v. State*, 219 S.W.3d at 394 (rejecting argument that declaration including phrase "according to my belief" failed to substantially comply with statute where declaration also said "under penalty of perjury").

Accordingly, the trial court did not abuse its discretion in admitting the T-Mobile records. We, therefore, overrule Dominguez's first issue.

**Dallas Cowboys Shoes**

In his second issue, Dominguez contends that the trial court erred by admitting the shoes into evidence. Specifically, Dominguez argues that "the State did not demonstrate that the shoes presented at trial were the same pair owned by

14

[Dominguez]," and that the "chain of custody was neither accounted for nor reliable." The State responds that the chain of custody was adequately established.

Trial courts are given broad discretion in ruling on admissibility of evidence. *Druery v. State*, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007). Texas Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). This rule "does not require the State to *prove* anything." *Garner v. State*, 939 S.W.2d 802, 805 (Tex. App.—Fort Worth 1997, pet. ref'd); *see also Silva v. State*, 989 S.W.2d 64, 67–68 (Tex. App.—San Antonio 1998, pet. ref'd) (same). Instead, the rule "requires only a showing that satisfies the trial court that the matter in question is what the State claims; once that showing is made, the exhibit is admissible." *Garner*, 939 S.W.2d at 805; *see Druery*, 225 S.W.3d at 502 (holding that trial court acts within discretion in admitting evidence "where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified."). So long as the trial court's ruling admitting the evidence is within the zone of reasonable disagreement, we will conclude that the trial court acted within its discretion to admit the evidence. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

15

At trial, defense counsel objected to the introduction of the shoes, arguing that the State did not adequately establish the chain of custody and that identification likewise was inadequate.

Evidence may be authenticated or identified by different methods, including testimony from a witness with knowledge that an item is what it is claimed to be. TEX. R. EVID. 901(b)(1); *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd). Articles that are easily identifiable and substantially unchanged normally do not require chain of custody evidence. *Haq v. State*, No. 01-11-01057-CR, 2013 WL 1890260, *5 (Tex. App.—Houston [1st Dist.] May 7, 2013, pet. ref'd). "If the item has distinct or unique characteristics, a witness may authenticate it by testifying that he or she has previously seen the item at the relevant time and place and that the witness recognizes it by its distinctive characteristics." *Id.*; *Hartsfield v. State*, 200 S.W.3d 813, 817–18 (Tex. App.—Texarkana 2006, pet. ref'd); *Jackson v. State*, 968 S.W.2d 495, 500 (Tex. App.—Texarkana 1998, pet. ref'd).

In *Jackson*, the defendant was charged with sexually assaulting his step-daughter. 968 S.W.2d at 497. A search of his residence uncovered certain items, including blood-stained jeans. *Id.* at 498. The jeans were identified by the defendant's wife, who had personal knowledge that Jackson was wearing them

earlier in the day that the assault occurred. *Id.* at 500. Even though the defendant objected to a proper chain of custody concerning the jeans, his wife's identification of the jeans was sufficient to show the jeans were what the State claimed—his—regardless of a later-acquired blood stain that she had no ability to identify. *See id.* at 500.

Likewise, in *Hartsfield*, a witness sought to identify a box as the one that had been at a crime scene. 200 S.W.3d at 819. Relying on *Jackson*, the appellate court concluded that the box could be authenticated through witness testimony that the witness recognized it as the box from the restaurant where victims had been abducted. *See id.* at 818 (citing *Jackson*, 968 S.W.2d at 495, 500). In both cases chain of custody evidence was unnecessary; witness identification of the evidence was sufficient for admissibility. *See Jackson*, 968 S.W.2d at 500; *Hartsfield*, 200 S.W.3d at 818. Once evidence is properly authenticated, questions concerning its care and custody affect the weight of the evidence, not its admissibility. *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997); *Alvarez v. State*, 857 S.W.2d 143, 147 (Tex. App.—Corpus Christi 1993, pet. ref'd).

Here, Garcia's daughter testified that she gave Dominguez a pair of white Dallas Cowboys Reebok shoes for Christmas four months before the murders and that she had seen him wear the shoes often. The shoes were white with the word

"Cowboys" written on the sides in blue. She specifically stated that the pair of shoes she bought him was size 11.

Garcia's son-in-law testified that he saw the Dallas Cowboys Reebok shoes being placed into the trunk before they left on their trip to San Antonio the day after the murders. Garcia's daughter testified that she found the shoes in her trunk several months after the abandoned trip. When she found the shoes, she placed them in a white plastic bag and stored them in a seldom used closet in her apartment. She notified the police that she found the shoes and stored them until the police picked them up several months later.

At trial, Garcia's daughter viewed the shoes. She testified that the white plastic bag in which they were presented at trial was the same bag she had used to store them. She further testified that she could identify the shoes as being the pair of white Dallas Cowboys Reebok shoes that she bought for Dominguez and that she had seen him wear often. Finally, she confirmed that the shoes in evidence were a size 11—the same sized shoe that she had purchased.

This testimony was sufficient to permit the trial court to reasonably believe that a jury reasonably could find that the exhibit was what the State claimed it to be—the shoes Dominguez owned. TEX. R. EVID. 901; *see Druery*, 225 S.W.3d at 502; *Jackson*, 968 S.W.2d at 500 (permitting witness to authenticate exhibit by testifying that she saw exhibit at earlier time and recognized it). To the extent

Dominguez complains that the shoes were kept in the daughter's apartment for several months before being given to the police, that the daughter moved in the interim, or that the daughter was mistaken in her identification, those matters go to the weight of the evidence, not to its admissibility. *See Lagrone*, 942 S.W.2d at 617; *Alvarez*, 857 S.W.2d at 147; *Hartsfield*, 200 S.W.3d at 818. We conclude that the trial court did not abuse its discretion in admitting the shoes into evidence.

We overrule Dominguez's second issue.

### Conclusion

Having overruled both of Dominguez's issues, we affirm the trial court's judgment.


Harvey Brown
Justice

Panel consists of Justices Keyes, Bland, and Brown.

Publish. TEX. R. APP. P. 47.2(b).