**Opinion issued November 19, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00778-CR

———————————

### SAENGDAVONE SOUVANNASANE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 396th District Court**
**Tarrant County, Texas[1]**
**Trial Court Case No. 1570302R**

**MEMORANDUM OPINION**

---

[1]     Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court from the Court of Appeals for the Second District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals).

Saengdavone Souvannasane shared an apartment with his ex-girlfriend, Jane.[2] One afternoon, Jane texted relatives that Souvannasane had forced her to have sex with him and had threatened to kill her. The police were called, and Souvannasane was arrested and later convicted of multiple offenses, including sexual assault. A Tarrant County jury assessed a punishment of two years of confinement for two of the offenses and a punishment of five and one-half years of confinement for the two other offenses.

Souvannasane raises two issues on appeal. First, he contends the unobjected-to portion of the court's punishment charge that informed the jury that an incarcerated person's period of confinement may be lengthened or shortened through adjustments to his "good conduct time" violated Souvannasane's rights to due process and due course of law. He argues that he was not eligible for good conduct time on a sexual-assault conviction and that instructing the jury on an irrelevant issue had the potential to confuse the issues. Second, Souvannasane argues the trial court abused its discretion by admitting evidence of a weapon Jane found next to the bed where the sexual assault occurred, arguing that the weapon was not alleged to have been used in the assault, was not found until weeks after the assault, and, therefore, had no relevance to any issue to be resolved by the jury.

We affirm.

---

[2]     We refer to the complaining witness by a pseudonym to protect her privacy.

**Background**

Souvannasane and Jane dated for about nine years. Most of that time was spent in another state. When Jane received a job offer in Texas in mid-2016, the couple moved to Texas and rented an apartment together. The relationship began to deteriorate after the move. In February 2017, Jane told Souvannasane she wanted to see other people. The next month, she told him she wanted to end the relationship completely. There were still a couple of months left on their apartment lease, so the two agreed to continue to live together in the apartment until the lease expired, though in separate bedrooms.

Later that month, Souvannasane returned from work mid-day and found Jane in the apartment. She told him she was leaving to run errands. According to Jane, Souvannasane told her to wait because he had something for her. He walked toward her holding a shopping bag. When she looked inside and saw it was empty, he suddenly punched her in the stomach and forced her to the floor with his hands around her neck. Jane testified she was "in shock," scared, and unable to breathe. Through his subsequent comments to her that afternoon, Jane learned that Souvannasane knew more about her recent dates than she had realized. Souvannasane wanted Jane to end any outside relationship, delete her recent contacts from her phone, and resume a sexual relationship with him.

Jane testified that Souvannasane choked her until she became lightheaded, then dragged her to his master bedroom. He reached between the mattress and the bedframe and took out clothesline rope, duct tape, and zip ties. Jane felt panicked. She had no idea those items were behind his mattress.

After retrieving the zip ties, Souvannasane began to bind her wrists and indicated he was going to bind her ankles as well. Jane decided that she needed to convince him not to use the zip ties or else she would not be able to run if given a chance to escape. Through some negotiation, he tied her wrists together with a nearby scarf and left her legs free.

As these events took place, Souvannasane questioned Jane about her recent dates and why she was ending their relationship. He commented about specific places she had been recently. It appeared to her that he had either followed her or had someone else follow her.

After Jane's wrists were bound, Souvannasane told her that they were not going to leave the apartment without each other, "whether it was dead or alive." He tied the rope into a noose and said he was going to put it around her neck. Jane testified that, through threat and intimidation, Souvannasane forced her to engage in oral sex and vaginal sex. She explained: "I didn't want to do it, but I was going to do what I had to so that he wouldn't hurt me anymore."

After, the two were on the couch. He was watching TV, and she was crying. At some point, Souvannasane told her that if she called the police, he would come after her or have one of his friends do it. Jane was holding her phone, but he would not let her use it. Then, her uncle texted her. She showed Souvannasane the text and told him what she planned to write in response. Souvannasane did not object, so Jane began typing. In her message, Jane told her uncle that Souvannasane had choked and punched her. She wrote: "Don't come or call the cops, he will kill me."

Jane testified that Souvannasane was a gun owner. While he never threatened her with a gun that day, she knew he owned guns and she believed he would kill her.

Later that afternoon, Jane convinced Souvannasane that they should leave the apartment and stop by another relative's home. There, she texted her out-of-state aunt, with whom she was close, about what had happened. While they were at that relative's house, the police arrived. Jane's uncle had contacted the police and provided the relative's address for them to intervene.

The police interviewed Souvannasane and Jane separately. Souvannasane admitted that he had grabbed Jane and prevented her from leaving the apartment, but he did not admit to anything more. In her interview, Jane described the physical assault and sexual assault. She told the police about the rope, duct tape, and zip ties. The police officer who interviewed Jane testified that she appeared distraught and scared.

The police arrested Souvannasane. An officer accompanied Jane back to the apartment. There, the officer found and photographed the rope, duct tape, and zip ties. The photographs were admitted into evidence. The officer also photographed red marks on Jane's neck. The police also took possession of Souvannasane's guns that could be located.

Weeks later, as she was packing up her belongings in the apartment, Jane found a gun inside a safe box between the same mattress and headboard where Souvannasane had retrieved the rope, duct tape, and zip ties.

When Jane testified about finding the gun, Souvannasane objected, arguing that the gun was not relevant to any issue of fact. He partially based his assertion on the fact that Jane never testified that Souvannasane had threaten her with a gun or a gun during the assault. Souvannasane argued that Jane had been unaware of the gun until she found it weeks after the assault. The State responded that the gun was found in the same place as the zip ties and other items used in the assault and that its proximity "goes directly to intent." The trial court overruled the objection.

Jane's testimony continued. She discussed submitting to a sexual-assault nurse examination (SANE), describing the assault to the SANE nurse, and being photographed.

Souvannasane did not testify.

6

At the conclusion of evidence, the court's charge was read to the jury. There were four guilt/innocence questions related to four separate offenses: (1) sexual assault based on the allegation of coerced oral sex; (2) sexual assault based on the allegation of coerced vaginal sex; (3) unlawful restraint; and (4) felony assault of a household member or person in a dating relationship. The jury found him guilty of all four counts.

Souvannasane did not testify in the punishment phase, but various family members did. The court's punishment charge was read to the jury. It included language that, at the time, was authorized by statute about the use of good-conduct time for Texas prison inmates.[3] Souvannasane did not object to the charge.

The jury sentenced him to five and one-half years of confinement for the second and fourth counts and two years of confinement for the first and third counts.

Souvannasane appealed.

**Jury Charge**

In his first issue, Souvannasane challenges a portion of the court's punishment charge that instructed the jury about the existence of "good conduct time," informed

---

[3]  *See* TEX. CODE CRIM. PROC. art. 37.07, § 4 (requiring that, in certain prosecutions, the jury be instructed during the punishment phase of trial about good-conduct time). An amendment to this provision went into effect after Souvannasane's conviction. *See* Act of May 15, 2019, 86th Leg., R.S., ch. 260, § 1(a), 2019 Tex. Sess. Law Serv., ch. 260 (enacting House Bill 1279). The amended language does not apply to this appeal.

the jury that good-conduct time may shorten a period of confinement, and instructed the jury not to consider the extent to which good-conduct time may be awarded to or forfeited by Souvannasane. *See* TEX. CODE CRIM. PROC. art. 37.07, § 4 (effective January 1, 2017 to August 31, 2019). According to Souvannasane, the instruction violated his rights to due process and due course of law because his sexual-assault conviction made him ineligible for a reduction in his period of incarceration based on the accumulation of good-conduct time, leaving the instruction inapplicable and confusing to the jury. Acknowledging that he did not object to the charge during trial, Souvannasane argues it meets the threshold for egregious harm to require reversal, even without a trial objection. *See Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

Souvannasane's brief states that, in 2002, the Court of Criminal Appeals considered and rejected an argument similar to the one he now asserts but that he is raising it in this appeal "to preserve the issue for further review." The case he refers to is *Luquis v. State*, 72 S.W.3d 355 (Tex. Crim. App. 2002). There, the Court held that the Article 37.07 instruction on good-conduct time was not so misleading as to deny the defendant's right to due process or due course of law, even if the defendant was not eligible for good-conduct time. *Id.* at 364; *see* TEX. CODE CRIM. PROC. art. 37.07 (effective September 1, 2001 to August 31, 2005).

Since *Luquis*, other appellants have argued Article 37.07 violates their due process and due course of law rights when the instruction is given in the context of a defendant ineligible for a shorter incarceration based on accumulated good-conduct time. Texas intermediate appellate courts have overruled those challenges, citing the *Luquis* holding as binding precedent. *See Sanders v. State*, 255 S.W.3d 754 (Tex. App.—Fort Worth 2008, pet. ref'd) (concluding that court was bound by holding in *Luquis* that inclusion of good-conduct-time instruction in court's charge did not violate defendant's constitutional rights even though defendant was not eligible for a shorter sentence due to good conduct); *Rogers v. State*, 87 S.W.3d 779, 783 (Tex. App.—Texarkana 2002, pet. ref'd) (noting that multiple courts have applied *Luquis* to reject similar due-process arguments); *see also Thomas v. State*, No. 02-09-00341-CR, 2010 WL 3377792, at *2 (Tex. App.—Fort Worth Aug. 2, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that *Luquis* was binding precedent and held that good-conduct-time instruction did not violate defendant's constitutional right even if the defendant was not eligible to have his period of incarceration reduced by good conduct); *Jennings v. State*, No. 02-08-00145-CR, 2009 WL 1564961, at *5 (Tex. App.—Fort Worth June 4, 2009, pet. ref'd) (mem. op., not designated for publication) (same).

We likewise conclude that Souvannasane's challenge to the Article 37.07 instruction is without merit given the holding of the Texas Court of Criminal Appeals in *Luquis*. As a result, we overrule Souvannasane's first issue.

## Evidentiary Ruling

In his second issue, Souvannasane contends the trial court abused its discretion by overruling his relevance objection to evidence of the gun Jane found behind the master-bedroom mattress weeks after the assault.

### A. Standard of review

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time it ruled, then we must uphold the judgment. *Id.* We will uphold a trial court's ruling on the admissibility of evidence as long as the ruling was within the zone of reasonable disagreement. *Id.*; *Hung Phuoc Le v. State*, 479 S.W.3d 462, 469–70 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

### B. Applicable law

Except as otherwise provided by an applicable statute or rule, "a jury is entitled to have before it 'all possible relevant information about the individual defendant whose fate it must determine.'" *Sells v. State*, 121 S.W.3d 748, 766 (Tex. Crim. App. 2003) (quoting *Matson v. State*, 819 S.W.2d 839, 850 (Tex. Crim. App.

10

1991); *see* TEX. R. EVID. 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401. The consequential fact need not be contested for the evidence to be relevant. *Lockhart v. State*, 847 S.W.2d 568, 573–74 (Tex. Crim. App. 1992). "Evidence is relevant if it influences facts that concern the ultimate determination of guilt." *Id.* at 574.

## C. Trial court did not abuse is discretion in ruling that the found gun was relevant

One of the defense themes, raised during opening statements, was that there was "a reasonable explanation" for the evidence "found in that apartment," like the rope, duct tape, and zip ties, and that it only "looks bad" for Souvannasane if it is "taken out of context." Under Souvannasane's trial theme, having moving supplies in the apartment was reasonable because Souvannasane and Jane were planning to move soon. The rope, duct tape, and zip ties were not evidence of an intended or committed sexual assault.

The State's theory was that Souvannasane planned and intended to assault Jane because he feared he was losing control over her and angry about her dating other men. The prosecutor stated in opening statements that the evidence would show that the rope, duct tape, and zip ties were hidden in Souvannasane's bedding and that he used them to threaten Jane and coerce her into sexual acts.

11

Thus, one of the issues of consequence in the trial was whether the rope, duct tape, and zip ties were innocuous or evidence of Souvannasane's sexual assault of Jane.

Once the jury began receiving evidence, Jane testified that Souvannasane punched her, choked her, and then moved her to the master bedroom. There, he pulled the rope, duct tape, and zip ties from the space between his mattress and headboard. She had no idea those items were there until she saw them. He then threatened her with those items to coerce her into sexual acts. Jane testified that she knew Souvannasane was a gun owner and she was afraid, in part, because she "didn't know what else he ha[d] in that room or if there was anybody else there, especially since he had the rope, duct tape, the zip ties. [She] didn't know if he had any weapons hidden anywhere."

Later, Jane was asked if she found anything concerning when she eventually moved out of the apartment. Jane testified that, several weeks after the assault, while she "was cleaning up the bedding area in the master bedroom, there was a gun found in that same space but a little bit further up that [she] had no idea was there." It was at that point Souvannasane made his relevance objection, which the trial court denied.

The threshold for relevance is low, requiring only that the matter have "*any tendency* to make the existence of any fact that is of consequence . . . more probable

12

or less." *Haley v. State*, 173 S.W.3d 510, 520 (Tex. Crim. App. 2005) (J. Keller, concurring) (quoting Rule 401 and noting low threshold); *see* TEX. R. EVID. 401. We conclude that evidence of a gun hidden in the same location where the rope, duct tape, and zip ties were hidden tended to make the existence of a fact of consequence more or less probable. The jury could have found that Souvannasane's decision to hide the rope, duct tape, and zip ties where he also hid a gun tended to support a conclusion that Souvannasane intended to use those items in a manner unrelated to the normal process of boxing up one's belongings and moving homes. That the rope, duct tape, and zip ties were stashed in the same place as a weapon was at least marginally relevant to the issue whether the supplies were intended for an innocuous or sinister purpose. Moreover, the jury could have found that the decision to hide the rope, duct tape, and zip ties in the same location as the gun indicated that Souvannasane intended to use those items against Jane to coerce sexual acts and rejected the defensive theory that the sexual conduct resulted from miscues and "mixed messages."

Accordingly, the trial court did not abuse its discretion in determining that the evidence of the found gun was relevant and admissible. *See Dominguez v. State*, 441 S.W.3d 652, 657 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (stating that appellate court will not disturb trial court's evidentiary ruling so long as it is within zone of reasonable disagreement).

We overrule Souvannasane's second issue.

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Kelly, and Landau.

Do not publish. TEX. R. APP. P. 47.2(b).