

# NUMBER 13-24-00487-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LOWELL WILLIAMS,                                                                    Appellant,

v.

THE STATE OF TEXAS,                                                                 Appellee.

## ON APPEAL FROM THE 117TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

## OPINION

### Before Chief Justice Tijerina and Justices West and Cron
### Opinion by Justice West

A jury convicted appellant Lowell Williams of eleven counts of various sexual

assault offenses against K.P.,[1] his stepdaughter. After the jury assessed punishment, the

---

[1] To protect the identity of the minor child, we refer to her by her initials. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

trial court sentenced appellant to fifty-five years' imprisonment. Appellant argues that the trial court abused its discretion when it (1) allowed K.P. to testify with her service dog, and (2) when it overruled appellant's authentication objection to DNA evidence. We hold that any alleged error in allowing K.P. to testify with her service dog was harmless, and the trial court did not err when it overruled appellant's objection to the DNA evidence. Accordingly, we affirm.

## I.  BACKGROUND

Appellant was indicted for one count of continuous sexual abuse of a young child (Count 1), two counts of aggravated sexual assault of a child (Counts 2 and 5), two counts of indecency with a child (Counts 3 and 4), two counts of sexual assault of a child (Counts 6 and 7), five counts of sexual assault (Counts 8–12), and five counts of prohibited sexual conduct (Counts 13–17).[2] *See* TEX. PENAL CODE §§ 21.02, 21.11, 22.011, 22.021, 25.02. The State dismissed Count 5 prior to trial due to double jeopardy issues with Count 1. The jury rendered acquittals as to Counts 2–4, 7, 11, and 16 and convicted appellant of the remaining eleven offenses.

K.P. was twenty-two years old at the time of the trial. Before her outcry, her family consisted of her mother, appellant, and her younger sister. K.P. testified that appellant came into her life when she was about seven or eight years old, and appellant sexually abused her until she was eighteen years old. She recounted various incidents where appellant touched her vaginal area with his hand, penetrated her anus with his sexual organ, and forced her to perform oral sex on him. In eighth grade, her family moved to

---

[2] The State reindicted appellant for sixteen counts of sexual offenses against K.P. but proceeded on the original seventeen counts.

Corpus Christi, and she described multiple incidents at the Corpus Christi home where appellant penetrated her anus or vagina with his sexual organ, penetrated her vagina with a black vibrator, and forced her to perform oral sex.

K.P. testified that, on multiple occasions, appellant threatened that if she told anyone about the abuse, he would kill her and the people she told. Once, after appellant bought pregnancy tests for K.P., he said, "I'm going to kill you if these come back positive."

The last act of sexual abuse occurred on January 29, 2021, while K.P. was living at home during her first year of college. Earlier in the day, K.P. sensed that appellant was angry. While she was working on a school assignment in her bedroom, appellant entered, sat on her bed, and asked her if she wanted to know why he was mad. K.P. testified that she was "very scared to answer" because she did not want to anger him further. He then got off the bed and held one of her arms to stand her up. She stated, "Because of—just the amount of abuse that I had already gone through[,] I knew that it could [be] worse if I resisted." Appellant then faced her toward the bedroom door, pushed her back to make her bend over, and then "swung [her] around over to [her] bed." Appellant, while behind her, pulled down her shorts and her underwear and penetrated her anus with his sexual organ. K.P. asked him to stop and started crying. She stated, "I remember it being so bad and, like—the crying so bad, that I was snotting into my glasses." K.P. said the abuse lasted for about ten minutes and ended when he ejaculated in her anus. After appellant left, he called K.P. into the living room and yelled at her because "the house was a mess" from her Etsy business. Afterwards, K.P. went back to her room and changed clothes.

About two weeks later, K.P. outcried to her mother. K.P.'s mother called the police, and K.P. made a statement to an officer that same day. Pedro Ybarra, a detective with

3

the Corpus Christi Police Department (CCPD), was assigned to K.P.'s case and interviewed K.P. a couple days after her outcry. Ybarra determined that there was "possible evidence still inside that residence at that time," specifically, "DNA evidence that may be attached to an article of clothing she was wearing . . . at the time of the assault." Ybarra and officers visited the home to collect the articles of clothing K.P. had worn during the January 29 assault. Body camera footage from one of the patrol officers that day was admitted into evidence.

The body camera footage showed that K.P. accompanied the officers and identified which articles of clothing to be collected, specifically four pairs of underwear and a pair of shorts. At trial, after the defense objected to the chain of custody of the collected underwear, K.P. was recalled to authenticate the clothing. K.P. was presented with the body camera footage, and she explained that she "was picking out what [she] wore the day of the incident on the 29th." The State then showed K.P. the photographs of the collected garments, and she testified that the photos depicted "what [she] pulled out during the video." She specifically remembered the underwear she was wearing during the January 29 assault was from a new pack. She identified four pairs of underwear that came from that pack, which were given to the patrol officers and ultimately were sent to a Texas Department of Public Safety (DPS) laboratory for testing. DPS forensic scientists identified a stain on one pair of underwear that tested positive for semen and forwarded the sample for "Y-STR testing" or "male specific testing." The Y-STR test identified sperm cells with DNA from a single individual or profile. The DNA profile was "not expected to occur more frequently than 1 in 5,471 males," and appellant could not be excluded as the source.

K.P. sought counseling shortly after her outcry. She testified that she was prescribed medications for depression, anxiety, and issues sleeping. She has been diagnosed with PTSD, "ulcerative colitis," which she explained are flare ups of rectal bleeding, and Postural Orthostatic Tachycardia Syndrome (POTS), a fainting condition. She also experiences "psychogenic nonepileptic seizures," which she explained are seizure-like episodes which do not damage the brain like a normal seizure.

Holly Felts, a Licensed Professional Counselor, worked as a counselor in the CCPD Family Violence Unit in February 2021. Felts met with K.P. regularly from February 2021 until July 2022. Felts testified that K.P. has experienced "repeated trauma," and she diagnosed K.P. with complex PTSD. During their initial sessions, K.P. told Felts she had thoughts of suicide because she "felt like she had too big of a mountain to climb."

Dr. Maureen Hart, K.P.'s physician, testified that she treated K.P. for "anxiety, major depression, POTS, . . . PTSD, ulcerative proctitis," "ADHD," and "psychogenic non-epileptic seizures." Dr. Hart testified that K.P.'s pseudo seizures are "usually associated with anxiety, trauma, depression, [or] some sort of psychological illness." Dr. Hart said K.P. told her that her the pseudo seizures were "triggered by coming back to Corpus Christi" because "she had been abused[,] and this trial was coming up and she was very nervous about it."

Appellant testified and denied the accusations. Appellant did not know why K.P. made the accusations but insinuated that K.P. was "easily influenced," and he did not think "any of this was her idea." He testified that his marriage was "[o]n the brink of disaster," and the marital issues between him and K.P.'s mother were well known,

5

including her mother's affairs and heavy drinking, and her mother's concerns that appellant would take custody of K.P.'s younger sister if the couple divorced.

The jury convicted appellant of Count 1 (continuous child sexual abuse), Count 6 (sexual assault of a child), Counts 8–12 (sexual assault), Counts 13–15 and 17 (prohibited sexual conduct). The jury assessed forty years' imprisonment as to Count 1 and fifteen years' imprisonment as to Count 6.[3] The trial court ordered Counts 1 and 6 to run consecutively, and the remaining sentences to run concurrently. This appeal ensued.

## II.    SERVICE ANIMAL

By his first issue, with two subparts, appellant argues that the trial court abused its discretion when it allowed K.P.'s service dog to accompany her during her testimony.

### A.    Pertinent Facts

Prior to trial, the State filed a motion to allow K.P. to testify with a service animal. The motion stated that "[K.P.] has medical conditions and disabilities necessitating the use of a service dog[,] including PTSD and a fainting condition." Her service dog, Bucky, was "trained to perform services for it[]s owner" and "can sense when a fainting episode is about to occur and alert [K.P.]." K.P. has had Bucky since August 2021 and obtained him through Scouts Legacy Service Dogs in Dallas. Bucky was "three years into a four-year training protocol" at Scouts Legacy. The motion also provided that "[K.P.] will have two additional handlers" to assist with Bucky's needs "while court is in session if the need arises." The State cited "Texas Government Code 21.012," "Texas Human Resources Code 121.001," and the "Americans with Disabilities Act, Title 42, Ch 126, Sec. 12101"

---

[3] The jury assessed punishment as follows: Count 1 (continuous child sexual abuse) forty years' imprisonment; Count 6 (sexual assault of a child) fifteen years' imprisonment; Counts 8–12 (sexual assault) ten years' imprisonment as to each; Counts 13–14, 17 (prohibited sexual conduct) five years' imprisonment as to each; and Count 15 (prohibited sexual conduct) community supervision.

6

for authority to grant its request. Attached to the motion were letters from K.P., one of her college professors, Scout's Legacy Service Dogs, and Laveta Jarrett, an advanced practice registered nurse and K.P.'s therapist.

At the hearing on the motion, the State called Jarrett to testify. Jarrett explained that K.P. suffers from "severe anxiety," "panic attacks," and "pseudoseizures," and she was diagnosed with PTSD and POTS. Jarrett stated that Bucky helps K.P. manage her symptoms by nudging her or "apply[ing] pressure to her legs or to her hands or wherever he . . . can get to" and "help[s] her become aware that she needs to do a breathing pattern or that she needs to sit down, that she needs to pull a car over." Before K.P. had Bucky, K.P. "could become completely debilitated in various settings without warning." Jarrett opined that K.P. cannot participate in everyday life activities without Bucky, and "it is imperative that she has him with her." Jarrett noted that Bucky is "a very calm animal," and she has "never heard him bark."

Defense counsel argued that the State failed to prove the requirements under the Texas Government Code Section 21.012. Specifically, defense counsel contended that Bucky was not a qualified therapy dog because he had not graduated or completed "a program operated by an assistance dog organization," the State failed to identify the "handler" who would manage the dog at trial, and the State failed to provide proof of liability insurance for the dog. Defense counsel also argued that "the purpose of the dog . . . [wa]s to elicit sympathy from the juror[s] and to support the State's case in chief." The trial court granted the State's motion.

At trial, just prior to K.P.'s testimony, defense counsel raised concerns with Bucky's potential "reactions" to her testimony. The trial court granted a running objection to any

7

reactions the dog had to K.P.'s testimony. The trial court also instructed the jury prior to K.P.'s testimony to "not make any assumptions or draw any conclusions based on the presence of this service dog." The same instruction was included in the jury charge.

K.P.'s testimony spanned three days. On the first day, Bucky whimpered twenty-nine times throughout her testimony. During a recess, defense counsel re-urged the objection to the service dog's presence and contended that the whimpering was "constant," "distracting," and "extremely prejudicial because every time [K.P.] says something, there it goes and it sounds like it's almost consoling her." The State disagreed that the whimpering was constant and with defense counsel's "characterization of the whimpering." The trial court agreed that the dog's whimpering was distracting, but not prejudicial, and requested that the State confer with K.P. to see if she could continue her testimony without Bucky. K.P. agreed, and Bucky was placed in the courtroom gallery. Bucky whimpered two more times before the end of her testimony for the day. Over the next two days of K.P.'s testimony, Bucky remained in the gallery and did not whimper.

## B. Rule 403 Not Applicable

We first address appellant's argument that the trial court erred when it overruled defense counsel's objection that "the service animal's presence would be unfairly prejudicial." *See* TEX. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). Appellant contends that the trial court was required to "weigh the probative value of the evidence (or, in this case, the value of the service animal's presence) against the danger of unfair prejudice, confusion of issues, or

8

misleading the jury," and, consequently, the service dog's presence violated Rule 403. *See id.*

Appellant has failed to show how the service dog is "evidence" governed by the Texas Rule of Evidence. *See* TEX. R. APP. P. 38.1(i). We have found no authority that a service dog whose purpose is to assist a witness's medical needs during their testimony can be considered evidence. Accordingly, we reject appellant's argument that Rule 403 applies, and for that reason we decline to conduct a Rule 403 analysis or balancing test. *See id.*; *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005) (providing the four factors for a Rule 403 analysis).

## C.    Discussion

Appellant next argues that the trial court erred when it ruled that K.P. could testify with her service dog because the trial court failed to comply with Texas Government Code Section 21.012. *See* TEX. GOV'T CODE § 21.012. Section 21.012 authorizes the trial court to allow a witness to testify at a court proceeding with a qualified "facility dog" or "therapy dog" if "the presence of the dog will assist the witness in providing testimony," and "the party petitioning for the order provides proof of liability insurance coverage in effect for the dog." *Id.* § 21.012(c).[4] We will assume, without deciding, that the trial court erred when it allowed K.P. to testify at trial with her service dog. *See, e.g.*, *Lambeth v. State*, 523 S.W.3d 244, 248 (Tex. App.—Beaumont 2017, no pet.) (presuming that error occurred and proceeding to conduct a harm analysis). We turn to consider what harm, if any, resulted from that error. *See* TEX. R. APP. P. 44.2.

---

[4] The State contends that appellant forfeited this issue on appeal because he failed to challenge the trial court's ruling under the ADA. We will assume, without deciding, that appellant preserved this argument for appellate review.

9

Notably, there is no case law involving Texas Government Code Section 21.012 or a trial court's ruling on the presence of a service dog for an adult witness during a court proceeding. We analyze the alleged error for harm under the standard for non-constitutional error because the error pertains to a statutory violation. *See id.* R. 44.2(b) (providing that all nonconstitutional errors that do "not affect substantial rights must be disregarded"); *Stredic v. State*, 663 S.W.3d 646, 655 (Tex. Crim. App. 2022) ("Because the error at issue is solely a statutory violation, the Rule 44.2(b) standard of harm for nonconstitutional errors governs the analysis."); *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005) ("In summary, when only a statutory violation is claimed, the error must be treated as non-constitutional for the purpose of conducting a harm analysis . . . ."). Under the harm standard for non-constitutional error, an error is reversible only when it has "a substantial and injurious effect or influence in determining the jury's verdict." *Stredic*, 663 S.W.3d at 655; *see also* TEX. R. APP. P. 44.2(b).

Appellant contends that he was harmed because "the dog's reactions to [K.P.]'s distress had a real chance of improperly bolstering [K.P.]'s credibility in the eyes of the jurors." The record shows that Bucky whimpered twenty-nine times during the first day of K.P.'s testimony wherein she testified during the last few hours of the day. However, Bucky did not whimper during K.P.'s testimony the following two days. Moreover, a review of the record indicates that Bucky seemed to whimper indiscriminately to the substance of K.P.'s testimony. For example, at the beginning of her testimony, K.P. testified about her Etsy business:

[The State]: Do you still own an Etsy business?

[K.P.]: Yes.

[The State]: And what do you sell there?

[K.P.]: Mostly stickers and shirts.

[The State]: And what is your art primarily inspired by?

[K.P.]: Nature and, like, animals and things around.

(Service dog whimpering.)

Bucky whimpered again later when K.P. testified about some of her hobbies and again when she testified about her school life and friends. This weighs against appellant's contention that Bucky's whimpering occurred when K.P. was "distressed" or that Bucky's whimpering was a "reaction" to K.P.'s testimony.

Moreover, the jury was instructed to "not make any assumptions or draw any conclusions based on" the dog's presence. We presume that the jury followed these instructions absent record evidence otherwise. *See Reed v. State*, 680 S.W.3d 620, 627 (Tex. Crim. App. 2023); *Patterson v. State*, 606 S.W.3d 3, 34 (Tex. App.—Corpus Christi–Edinburg 2020, pet. ref'd).

Appellant contends that "[e]ven with the charge instruction, the jury could have still concluded that the dog's behavior indicated [K.P.] was in distress due to trauma that could have only been caused by [a]ppellant." As described below, even if appellant is correct, such inference was cumulative of other evidence presented at trial. In *Lambeth v. State*, the appellate court addressed whether the trial court erred when it allowed a child complainant to use a dog as a support animal while testifying. 523 S.W.3d at 247–48; *see also* TEX. CODE CRIM. PROC. art. 38.074 § 3(b) (providing that the trial court may allow a child witness to have a "comforting item" or "a support person to be present" while the child testifies if, by a preponderance of the evidence, "(1) the child cannot reliably testify

11

without the possession of the item or presence of the support person, as applicable; and (2) granting the motion is not likely to prejudice the trier of fact in evaluating the child's testimony"). Lambeth, who was appealing his convictions for continuous child sexual abuse and aggravated sexual assault of a child, argued that the dog's presence and "sounds" caused the jury to be "overly sympathetic" to the complaining witness and "impaired[ed] the jury's ability to fairly evaluate the complaining witness's testimony." *Id.* at 245. The appellate court concluded:

> While Lambeth argues he was harmed because the jury would have inferred from the dog's presence that the complaining witness had a psychological injury, the record of the trial shows that Lambeth developed direct evidence from the complaining witness about the fact that the complaining witness was in therapy for the psychological problems she was suffering from having been sexually assaulted by Lambeth over a period of several years. Given evidence before the jury showing that the complaining witness was being treated for a psychological injury, and that the treatment related to the complaining witness's history of having been sexually abused, any inference the jury might have made connecting the complaining witness's psychological injury to Lambeth based on the presence of the dog would have been harmless.

*Id.* at 248.

In this case, K.P., her former counselor, and her physician, testified about K.P.'s medical issues that stemmed from the abuse she endured. K.P. "was being treated for a psychological injury," i.e., complex PTSD and pseudo seizures, and the treatment related to her "history of having been sexually abused." *See id.* Appellant does not challenge this evidence on appeal. Thus, any inference the jury might have made connecting K.P.'s medical issues to Bucky's presence is cumulative of this evidence, and, therefore, harmless. *See id.* ("[T]he inference that the complaining witness had a psychological injury based on the presence of the dog in the courtroom . . . was cumulative of more

12

direct evidence establishing that Lambeth's sexual misconduct caused the complaining witness to suffer psychological problems.").

Accordingly, we hold that any error in allowing K.P. to testify with her service dog did not have "a substantial and injurious effect or influence in determine the jury's verdict" and did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Stredic*, 663 S.W.3d at 655; *Lambeth*, 523 S.W.3d at 248. We overrule appellant's first issue.

### III.    DNA EVIDENCE

By his second issue, appellant argues that the trial court erred when it overruled his objection to the authentication of the underwear tested for DNA evidence because the State failed to establish the first link in the chain of custody.

### A.    Standard of Review & Applicable Law

We review a trial court's evidentiary rulings for abuse of discretion. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *See* TEX. R. EVID. 901; *see also Morales v. State*, No. 13-17-00279-CR, 2018 WL 6802127, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 27, 2018, no pet.) (mem. op., not designated for publication). Evidence may be authenticated by the testimony of a witness with knowledge "that an item is what it is claimed to be." *See* TEX. R. EVID. 901(b)(1). A chain of custody is sufficiently authenticated when the State establishes "the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory." *Mitchell v. State*, 419 S.W.3d 655, 659–60 (Tex. App.—San Antonio 2013, pet. ref'd) (quoting *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd)).

**B.      Analysis**

Appellant argues that "the State never established the beginning of the chain of custody" because it failed to establish that the garments tested were the ones selected by K.P.[5] He contends:

> Although [K.P.] selected five garments, there was no testimony confirming that those garments were placed in evidence rather than one of the many other articles of clothing lying nearby in the bedroom. Detective Ybarra, who sponsored the walk-through video of [K.P.]'s home, was not present in the bedroom during the collection of the clothing. No other officer testified that they collected the selected items, and there is no video footage of the items being collected. Defense Exhibit 3 depicts [K.P.] sorting through one large pile of clothing and one smaller pile. [K.P.] then selects four pair[s] of underwear and one pair of light blue shorts for testing. Law enforcement then left the bedroom and did not record what items were selected from the piles of clothes lying around.

(Internal citations to the record omitted).

We disagree that the State failed to show that K.P. was the first link in the chain of custody of the garments collected for DNA testing. The State presented K.P. with the video footage and images of the garments. She testified that the four pairs of underwear and shorts in the images were the same clothes she collected for the officers in her room in the video and were the same clothes she remembered wearing during the last assault on January 29. *See* TEX. R. EVID. 901(b)(1); *see, e.g.*, *Dominguez v. State*, 441 S.W.3d 652, 660 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding that witness's knowledge of the "white Dallas Cowboys Reebok shoes" that appellant wore was sufficient to authenticate the shoes); *Jackson v. State*, 968 S.W.2d 495, 500 (Tex. App.—Texarkana 1998, pet. ref'd) (holding that wife's personal knowledge of appellant's jeans was sufficient to authenticate the jeans).

---

[5] Because appellant only challenges the first link in the chain of testimony, we only address the evidence and argument as to that link.

Appellant contends, without citing to authority, that the procedure above was insufficient to show that K.P. was the first link in the chain of custody because K.P.'s testimony could not be corroborated with the "testimony or video footage of what items officers collected, as KP was unsure of what garments she was wearing." While K.P. testified that she was unsure which of the four underwear she was wearing at the time of the assault, she was certain that she was wearing one of those four pairs. Moreover, appellant has not directed us to any authority, nor have we found any, that a second witness or source of evidence is required to authenticate an object when a witness who has knowledge of the object testifies that the object is what it is claimed to be. *See* TEX. R. EVID. 901(a), (b)(1). We overrule appellant's second issue.[6]

**IV.    CONCLUSION**

The trial court's judgment is affirmed.

JON WEST
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
11th day of June, 2026.

---

[6] We deny all pending motions as moot.

15