**Opinion issued August 22, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00674-CR

## NO. 01-22-00675-CR

_____

## ANDREW PETE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1751814 & 1751815**

---

## MEMORANDUM OPINION ON REHEARING

Appellant, Andrew Pete, has filed a motion for rehearing of our March 21,

2024 opinion and judgment.[1]  We deny the motion for rehearing, withdraw our

---

[1]   On March 31, 2024, appellant's appointed appellate counsel filed a motion for
rehearing on appellant's behalf. *See* TEX. R. APP. P. 49.1.  Previously, on March

opinion and judgment of March 21, 2024, and issue this opinion and new judgment in their stead.

A jury found appellant guilty of two separate felony offenses of aggravated sexual assault of a child[2] and assessed his punishment at confinement for life for each offense, to run concurrently. In three issues, appellant contends that the trial court erred in admitting certain evidence, failing to hold a hearing on appellant's motion for new trial, and declaring a mistrial in appellant's first trial.

We affirm.

## Background

The complainant testified that she was born on February 4, 2002. The complainant had two older brothers, an older sister, and a younger sister, and she lived with her parents while growing up. The complainant graduated from high

___

29, 2024, appellant filed a pro se motion for rehearing. Because appellant is represented by appointed appellate counsel and is not entitled to hybrid representation, we dismiss appellant's March 29, 2024 pro se motion for rehearing and his pro se supplements to his motion for rehearing filed on May 16, 2024 and June 21, 2024. *See Ex parte Bohannan*, 350 S.W.3d 116, 116 n.1 (Tex. Crim. App. 2011) ("We have received numerous documents from [appellant] himself, but [appellant] is represented by counsel and is not entitled to hybrid representation. Because [appellant] is represented by counsel, we disregard his numerous pro se submissions and take no action on them." (internal citations and emphasis omitted)); *Ex parte Taylor*, 36 S.W.3d 883, 887 (Tex. Crim. App. 2001) ("Appellants are not allowed to have 'hybrid representation' on appeal, in which an appellant and [appellant's] attorney can present independent points to an appellate court.").

[2]  *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (a)(2)(B), (e); appellate cause no. 01-22-00674-CR, trial court cause no. 1751814; appellate cause no. 01-22-00675-CR, trial court cause no. 1751815.

school in 2020.  During her childhood, the complainant attended church regularly with her family.

The complainant further testified that when she was around seven to nine years old, she met appellant and appellant's wife, Elva Pete ("Elva").  Appellant and Elva met the complainant's family because Elva was the choir director at the family's church and the complainant's mother sang in the choir.  The complainant's father was also a musician at the church.  The complainant's mother and Elva became "very close friends," and appellant and the complainant's father became close friends as well.  The complainant's parents trusted appellant and Elva, and one of the complainant's older brothers, Zachary, had a close relationship with appellant.  Appellant was considered to be Zachary's godfather.  Appellant attended Zachary's sporting events and spent a lot of time with Zachary.

When the complainant's family would spend time with appellant and Elva, they would all go out to eat, go to the movies, go bowling, and hang out at each other's houses.  Appellant and Elva would attend the complainant's family's holiday gatherings and birthday parties.  According to the complainant, appellant bought her and her older sister a gaming system, games, purses, and Nutella.

The complainant also explained that her family spent time with appellant and Elva weekly, and they often saw appellant and Elva more than once a week.  The complainant would go to appellant and Elva's house often.  The complainant stated

that appellant and Elva were "pretty frequent people that were in [her] life." And there were times when she would talk and hang out with appellant alone. The complainant told appellant things because he would listen and he gave the complainant attention that she wanted and needed.

For instance, the complainant told appellant that when she was five or six years old until she was about nine or ten years old, her older brothers would "encourage [her] to touch their private parts and also explore [her] private parts." The complainant also told appellant that when she was five years old, she found her brother Zachary "masturbating in the game room" of her home while pornography was playing on the family's computer. Because of her brothers, the complainant continued seeing pornography in the home until she was about ten or eleven years old. Additionally, the complainant told appellant that when she was in kindergarten, she was seated on a school bus next to a boy and that boy made her "put [her] mouth on his penis." After the complainant would tell appellant such things, appellant appeared to be proud of her for having told him.[3]

The complainant further testified that when she was eleven years old, she and her siblings spent the night at appellant and Elva's home. The complainant and her

---

[3] The complainant also testified that when she was about ten or eleven years old, she was sitting in appellant's car alone with appellant, and she asked appellant "what pubic hair was." In response, appellant asked the complainant to show him her vagina so that he could show her. The complainant did not show appellant her vagina at the time.

4

two sisters slept in the guest bedroom together. At the time, the complainant had "bed-wetting issues," of which appellant was aware. During the middle of the night, appellant woke up the complainant so that she could use the restroom. When the complainant walked into the bathroom, appellant walked in behind her and locked the door. While the complainant went to the bathroom, appellant sat on the sink. Appellant had never come into the bathroom with the complainant before, and she felt uncomfortable by his presence. After the complainant finished using the restroom, appellant asked if he could have a hug, and the complainant complied. While the complainant hugged appellant, he groped her bottom outside of her clothing, meaning he "squeez[ed] [her] cheeks with his fingers." Appellant tried to put his hands into the complainant's shorts and grope her further, but the complainant tapped appellant on the shoulder, and he said something like, "Okay. Okay, . . . . Okay." Appellant told the complainant not to tell anyone because it would "ruin the relationship" appellant and Elva had with the complainant's family, which the complainant knew was an important relationship for her family.

A few weeks later, the complainant told her mother about what had happened with appellant in the bathroom, and although her parents asked if she was telling the truth, the complainant never said that the bathroom incident with appellant did not happen. However, the complainant's family continued to spend time with appellant and Elva. They continued to see appellant and Elva at church, and appellant still

5

attended Zachary's sporting events; appellant and Elva were still a part of the complainant's life, and appellant still had the ability to be around the complainant.

The complainant also explained that one day, when she was about twelve years old, she was asleep in her bedroom at her house.[4] The complainant's bedroom was located upstairs, and the complainant slept in the bottom bunk of a bunk bed in her room. On that particular day, the complainant's mother was in the kitchen downstairs making pancakes. The complainant woke up when appellant came into her bedroom, and she stood up. Appellant then asked the complainant to see a frame that he had made for her, which the complainant retrieved from her closet. She handed the frame to appellant. At the time, the complainant was wearing shorts and a t-shirt, and appellant put his hand in her shorts and in her underwear. Appellant then stuck his fingers in the complainant's vagina repeatedly. At some point, appellant stopped, groped his penis, and said, "Look how hard you made me." Appellant licked his fingers and then went to wash his hands before going back downstairs.[5] The complainant stated that she did not tell initially anyone about what had happened with appellant because she did not think anyone would believe her or that anyone would do anything about it.

---

[4] The complainant testified as to the address of her home and that her home was in Harris County, Texas.

[5] The complainant stated that she was less than fourteen years old when the bedroom incident occurred.

6

The complainant further recalled that another incident happened on a Sunday after church when she was about thirteen years old. The complainant's family, appellant, and Elva left church at the same time to head to the complainant's house. The complainant left church in appellant's car, just the two of them, because appellant told her that he would take her to buy arch supports. The complainant sat in the front passenger seat of the car, and appellant drove. According to the complainant, although she and appellant were "supposed to go to Walgreens [Pharmacy] to get [her the] arch supports," they did not. Instead, appellant called the complainant's parents "to ask them if they wanted him to pick up some chicken." The complainant's parents said they did, so appellant drove to a Popeyes Louisiana Kitchen restaurant ("Popeyes"). After getting chicken from Popeyes, appellant drove his car through a nearby neighborhood because he "wanted to touch [the complainant] again." Appellant said something like, "Let me show you how your boyfriend could finger you while you're in a car so no one could see." Appellant then told the complainant to turn her back toward him, so that she was facing the front passenger side window. He told her to put her leg up on the car seat and to unbutton the "bottom two buttons of [her] jumpsuit." He then stuck his hand down her pants and "started playing with [her] vagina." Appellant put his fingers inside

her vagina.[6]  Appellant stopped when they got to the edge of the neighborhood because "he didn't want to risk being seen."

Appellant then drove to an abandoned strip center and stopped.  He asked the complainant to "see and suck on [her] breasts."  The complainant was shocked and froze.  When appellant saw that she was scared, he said, "never mind," and told the complainant to button up her pants.  Appellant then drove her home.  When they arrived at the complainant's house, the complainant got out of the car and started "walking funny."  Appellant laughed and said, "You better stop walking like that."  The complainant did not tell anyone what happened that day.

Additionally, the complainant testified that on Mother's Day in May 2015, she went out to eat at a restaurant with her mother's family.  That day, the complainant told her maternal grandmother that she needed to talk, and they went to the restroom in the restaurant.  The complainant then told her grandmother about the bedroom incident and the Popeyes incident with appellant.  The complainant's grandmother comforted her, but she was adamant that the complainant needed to tell her mother.  Later that night, the complainant told her mother about the bedroom incident and the Popeyes incident, while she, her mother, and her grandmother stood in the driveway at the complainant's cousin's house.  The complainant's mother was

---

[6]     The complainant testified that this incident happened in Harris County, and she was less than fourteen years old when it occurred.

8

hurt, disappointed in herself, and frustrated. She cried and squeezed the complainant.

The next day, the complainant's mother took the complainant to see her therapist, Dr. Maria Peters.[7] The complainant told Dr. Peters everything that she had told her grandmother and her mother. The complainant also thought that her parents had reported appellant to law enforcement or Child Protective Services.

The complainant's maternal grandmother testified that the complainant was born in February 2002. On Mother's Day in May 2015, she and the complainant were seated together at a restaurant, along with other family members. The complainant was thirteen years old at the time. According to the complainant's grandmother, the complainant was not acting like herself; she was eating very fast, and she was not happy. The complainant's grandmother was concerned and asked the complainant "what[] [was] going on." The complainant responded that "[s]omething did happen," and then the complainant and her grandmother went to the restroom to talk.

---

[7] Dr. Peters testified that she began seeing the complainant in April 2015 when the complainant was thirteen years old. At the time, the complainant was getting into fights, being aggressive, and sexually acting out, which according to Dr. Peters, were behaviors consistent with a child that was being sexually abused. In May 2015, the complainant disclosed the sexual abuse to Dr. Peters after she told her mother. The complainant continued seeing Dr. Peters for two years, and during that time, the complainant was consistent with her story of about what had happened to her.

9

Inside the restroom, the complainant began to cry, and the complainant's grandmother hugged her. The complainant told her grandmother that she and appellant "were going to get some chicken" at Popeyes, and appellant "drove around and found a spot." Appellant then put his fingers in the complainant's vagina. The complainant's grandmother told the complainant that they needed to tell the complainant's mother, but the complainant did not want to.

Upon leaving the restaurant, the complainant's mother, the complainant's grandmother, and the complainant got in a car together. The complainant was very quiet. When they arrived at the place where the complainant's grandmother was staying, the complainant's grandmother told the complainant's mother that the complainant needed to tell her something. They all got out of the car, and the complainant told her mother about the Popeyes incident.

The complainant's mother testified that she had five children, and the complainant was born in February 2002. The complainant's mother met appellant and Elva through the family's church because she sang in the choir with Elva. The complainant's mother and Elva quickly formed a friendship, and appellant and the complainant's father became friends. At the time, the complainant was about ten or eleven years old.

The complainant's mother further explained that her family's relationship with appellant and Elva was "very close." The complainant's mother was very open

with appellant and Elva about things going on with her children. The families also went places together, spent time at each other's houses, went bowling, and "hung out a lot." Appellant and Elva would watch the complainant and her siblings at times, and because appellant and Elva lived close to the children's school, they would occasionally pick up the children from school. The complainant's older brother, Zachary, was appellant's godson, and appellant became a big part of Zachary's life. Appellant and Elva participated in the children's lives quite a bit. According to the complainant's mother, the complainant knew that she and the complainant's father trusted appellant and Elva. The complainant liked appellant when they first met, and she would talk to appellant about personal things. Appellant would do nice things for the complainant; he gave the complainant and her older sister a gaming system, and he made a stage for the complainant's birthday party. He also made a display case for the complainant's medals. In general, appellant had a giving nature toward the complainant and her siblings.

The complainant's mother further testified that one night, when the complainant was about eleven years old, she spent the night at appellant and Elva's home. At the time, the complainant was "having issues with bedwetting," and appellant and Elva were aware of those issues. Sometime after the night when the complainant stayed with appellant and Elva, the complainant told her mother about some inappropriate touching that had occurred. The complainant's mother spoke to

appellant and Elva about it, and appellant acted "shocked that [she] knew or that [she] had] found out about it." Appellant denied any inappropriate touching of the complainant and said that the complainant was lying. But the complainant told her mother that she was telling the truth, and her story stayed the same. The complainant's mother did not contact law enforcement officers though because she was not sure "if [anything] actually happened."

Following the inappropriate touching allegation, the complainant's family still spent time with appellant and Elva, and appellant was still allowed to be around the complainant, but not alone. Appellant was also still Zachary's godfather, and the complainant's mother still thought of appellant and Elva as family friends.

The complainant's mother further explained that on Mother's Day in May 2015, she went to a restaurant with some of her family members, including the complainant, who was thirteen years old at the time, and the complainant's maternal grandmother. Later in the night, when the complainant's mother dropped the complainant's grandmother off at the house where she was staying, the complainant's grandmother told her that the complainant needed to talk. The complainant appeared nervous and anxious, and she told her mother that appellant had stuck his finger in her vagina more than once. The complainant told her mother about the Popeyes incident, and she also told her that once when the complainant was upstairs in her bedroom at their house, appellant put his finger in her vagina

12

while the complainant's mother was downstairs in the kitchen.[8]  The complainant said that appellant had told her that "he wanted to show her how it was supposed to feel when a boy would do that to her."  The complainant cried as she told her mother about the Popeyes incident and the bedroom incident, which, according to the complainant's mother, would have occurred before the complainant turned fourteen years old.

As to the bedroom incident, the complainant's mother noted that she remembered a time when appellant came over to the family's house and went upstairs to the complainant's bedroom while the complainant's mother stayed downstairs.  At the time, appellant told the complainant's mother that he was going upstairs to look at a display case that he had previously made for the complainant that was broken.  Appellant was upstairs in the complainant's bedroom for about five minutes.

As to the Popeyes incident, the complainant's mother explained that she remembered that there was a day when the complainant was alone with appellant after the family left church.  On that day, the complainant's mother and the complainant's younger sister left church to go home and begin cooking.  Elva also left and came to the complainant's house.  When the complainant's father arrived

---

[8]  The complainant's mother testified as to the address of the family's home and that the home was in Harris County.

home, he told the complainant's mother that the complainant was with appellant and Zachary. But the complainant's mother told the complainant's father that Zachary had gone to visit another church member, which meant that the complainant was alone with appellant. This caused the complainant's mother to be concerned. Shortly thereafter, Elva received a telephone call from appellant, who asked if anyone needed chicken, and Elva said yes. Appellant then went to a Popeyes near the complainant's home. At some point, appellant and the complainant arrived back at the complainant's house, with the complainant sitting in the front passenger seat of appellant's car. The complainant did not tell her mother that anything happened while she was alone with appellant.

The complainant's mother further testified that after the complainant's disclosures in May 2015, the complainant's mother contacted the complainant's therapist, Dr. Peters, immediately.[9] Dr. Peters told the complainant's mother to bring the complainant to see her the next day, and she would show the complainant's mother how to file a report with Child Protective Services. The complainant's mother ended up filing a report that night.

C.R. testified that she grew up in Temple, Texas, and during her childhood, she lived with her mother and brother. C.R. met appellant when she was eleven

---

[9]     According to the complainant's mother, the complainant had been seeing a therapist because she was depressed and had been cutting herself. The complainant was also very angry and lashing out.

14

years old, and he was her mother's boyfriend. After C.R. met appellant, he moved into C.R.'s home. He also became involved in C.R.'s activities and school, and he helped her with volleyball and track. He would take C.R. to her activities to help her mother, and he would buy C.R. things. C.R.'s mother used to work long hours so often appellant, C.R., and C.R.'s brother were alone together. C.R.'s mother trusted appellant, and C.R. felt like she could trust appellant.

C.R. further explained that one day, when she was about twelve years old, appellant was laying down in his bedroom when C.R. and her friend got home from school. Appellant called C.R. and her friend to come lay down in bed with him and talk with him. Appellant "put [C.R.] on his chest to hold [her,] and [she] could feel his private area" "moving a little bit." This made C.R. feel uncomfortable, so she got up. C.R. "blew . . . off" the incident because "maybe [appellant] didn't mean it."

Next, when C.R. was still twelve years old, C.R. had a dream in which she was laying down in the family room watching television with appellant. Appellant then "lifted up [her] leg and started playing with [her] vagina with his fingers." When C.R. woke up, she was "real wet down there," and she "felt like [she] had been touched down there." She waited for appellant to go to work so that she could tell her mother that "something [had] happened last night."

While C.R. was talking to her mother, appellant called, and C.R.'s mother told appellant, "Hold on, my baby needs to talk to me." (Internal quotations omitted.) C.R. then told her mother that she believed that appellant had touched her the night before, but she "wasn't sure if it was reality or a dream." Right after C.R. finished speaking with her mother, appellant came home. C.R.'s mother then asked appellant, in front of C.R., if appellant had touched her, and appellant denied doing so. This made C.R. feel embarrassed, and like she was alone.

A few days later, appellant made C.R.'s mother look at C.R.'s vagina "to check her out to see if she[] [was] lying or if she[] [had been] doing anything" sexually. C.R.'s mother then looked at C.R.'s vagina while appellant was in the same room and watching. C.R.'s mother told appellant that C.R.'s vagina "looked normal." C.R. felt embarrassed, like she was "a bad person," and that she had "done something wrong." C.R. believed that appellant forced C.R.'s mother to look at her vagina.

The next day, appellant called C.R. into his bedroom and said that C.R.'s mother said that "he could look at [her vagina] because [she] shouldn't be getting that wet or whatever." C.R.'s mother was at work at the time. C.R. asked if they could call her mother, but appellant said, "No, she already knows what's going on, she's busy, she's already annoyed. Just let me check you out." (Internal quotations omitted.) C.R. felt alone.

In appellant's bedroom, C.R. sat on the bed, and appellant told her to take off her underwear so that he could "check" her vagina because she "shouldn't be getting th[at] wet if [she was] not doing anything" sexually with someone. C.R. then took off her pants and underwear, and appellant "opened [her vagina] up with his thumbs." Appellant then licked C.R.'s vagina before "retreat[ing] back to his knees." He then said, "Oh, my God, why did I just do that? Why'd I just do that?" (Internal quotations omitted.) C.R. was shocked and could not move. Appellant then opened C.R.'s vagina again with his hands and "said [that] it looked like a grown man could fit [her]." He then put his penis in her vagina. It took C.R.'s breath away. When appellant got off C.R., he went to the bathroom. He told C.R. to come to the bathroom and wash up. He made C.R. "use [her] mo[ther's] douche bottle to clean [her]self." C.R. did not tell her mother about the incident because she thought her mother "would ask [appellant about it] in front of [her]" and she did not think that she could trust her mother or that anything would be done.

C.R. further explained that after the incident, appellant continued to put his penis in her vagina until she was fourteen years old. When C.R. was twelve and thirteen years old, appellant put his penis in her vagina daily, and it sometimes happened two or three times a day. C.R. recalled that one Christmas day, when she was in the eighth grade, her home was full of people. There was moment during that day when she went to the bathroom. When she walked out of the bathroom,

appellant "grabbed [her] real fast" and took her to his bedroom. Appellant "opened the closet and bent [her] over and took [her] pants down." He put his penis in her vagina for less than a minute and then "ejaculated on the floor, pulled [her] pants up, and sent [her] back out to [her] family."

C.R. also testified that appellant put his penis in C.R.'s mouth many times. One night, when C.R. was thirteen years old, C.R.'s mother was asleep, and C.R.'s brother was in the bathroom. Appellant made C.R. sit on the floor with him and "suck his penis while [her] mom was literally a few feet away and [her] brother . . . could open the door and [see] everything from the bathroom across the hall." Additionally, appellant put his mouth on C.R.'s vagina many times, and one time his finger touched her anus.

According to C.R., appellant would often tell C.R. that she should be happy "[b]ecause while [her] peers [were] making names for themselves being fast, having sex with boys at school, [she] was not." She "was lucky to have it at home so the rest of the world could still think [she] was a virgin." Appellant also told C.R. that he was teaching her things about sex. And he would tell C.R. things that would make her feel like she could not tell anyone about what was happening to her.

For instance, one time, C.R. argued with appellant and told him that she was "fixing to let it be known." (Internal quotations omitted.) Appellant then put her in his car and started driving "dangerously fast." He told C.R. that he would "put [her

18

family] 6 feet under." This alarmed C.R. because appellant was "a big man" and he could overpower C.R.'s mother, C.R.'s brother, and C.R.

C.R. further testified that appellant moved out of her house when she was fourteen years old, but appellant was still involved in her life. He would still take C.R. to activities and bring her to his apartment to go swimming. Appellant would want C.R. and her brother to stay the night at his apartment, but C.R.'s mother would only let them go over to appellant's apartment for a little while. According to C.R., even after appellant moved out C.R.'s home, he still sexually abused her. For instance, when C.R. was fourteen years old, her mother let her go on a three-hour drive with appellant in appellant's truck. During the drive, appellant stopped at a truck stop and had sexual intercourse with C.R. in the truck.

The last time that appellant sexually abused C.R., appellant picked C.R. up from school during lunch. They went home, and appellant had sexual intercourse with her. When appellant brought C.R. back to school, appellant grabbed C.R.'s face and kissed her on the mouth. Because C.R.'s paternal grandfather had come to school to bring C.R. some food, he saw appellant kiss C.R. Although C.R.'s grandfather told her that she was "safe with him and [that she could] talk to him about anything," she did not tell him about the sexual abuse.

When C.R. was about sixteen years old, she told her mother about what appellant had done to her. C.R.'s mother reported the sexual abuse to law

enforcement. Although her allegations were investigated by law enforcement officers, about a year later, "they had to close" the case because "they didn't have enough evidence." C.R. was told that if she "f[ound] anything else or f[ound] anything else that could help, [to] be sure to come and bring it" forward. Appellant was never charged with an offense based on C.R.'s allegations of sexual abuse, and the investigation was closed because "there[] [was] not enough evidence."

Additionally, C.R. testified that when she was about twenty-three years old, a district attorney from Dallas County, Texas reached out to her and told C.R. that she was investigating appellant. The district attorney asked C.R. to tell her what she remembered about appellant sexually abusing her. In 2015, C.R. testified at a trial against appellant that involved a complainant named J.W.

During trial, the trial court admitted into evidence copies of three indictments from 2012 related to appellant. The first indictment alleged that on or about October 15, 2003, in Dallas County, appellant "did unlawfully then and there intentionally and knowingly cause the penetration of the female sexual organ of [J.W.], a child who was not then the spouse of [appellant], by an object, to-wit: the finger, of [appellant], and, at the time of the offense, [J.W.] was younger than 14 years of age."[10] The second indictment alleged that on or about April 1, 2004, in Dallas County, appellant "did unlawfully then and there intentionally and knowingly cause

---

[10] *See* TEX. PENAL CODE ANN. § 22.021 (aggravated sexual assault of child).

the contact and the penetration of the female sexual organ of [J.W.], a child who was not then the spouse of [appellant], by an object, to-wit: the sexual organ, of [appellant], and, at the time of the offense, [J.W.] was younger than 14 years of age."[11] The third indictment alleged that on or about March 1, 2003, in Dallas County, appellant "did unlawfully then and there intentionally and knowingly cause the contact and penetration of the mouth of [J.W.], a child, who was not then the spouse of [appellant], by the sexual organ of [appellant], and, at the time of the offense, the child was younger than 14 years of age."[12]

The trial court also admitted into evidence copies of three judgments of conviction related to appellant. The first judgment, from the 292nd District Court of Dallas County, trial court cause number F-1233559-V, shows that appellant was found guilty of the felony offense of aggravated sexual assault of a child and the trial court assessed his punishment at confinement for eight years. The second judgment, from the 292nd District Court of Dallas County, trial court cause number F-1233560-V, shows that appellant was found guilty of the felony offense of aggravated sexual assault of a child, and the trial court assessed his punishment at confinement for eight years. The third judgment, from the 292nd District Court of Dallas County, trial court cause number F-1233561-V, shows that appellant was

---

[11] *See id.*

[12] *See id.*

found guilty the felony offense of aggravated sexual assault of a child, and the trial court assessed his punishment at confinement for eight years. The judgments also indicate that appellant's three sentences would run concurrently, and they were assessed against him in 2017.[13]

## Admission of Evidence

In his first issue, appellant argues that the trial court erred in admitting the testimony of C.R. because it constituted extraneous offense evidence and "the State had previously declined to seek an indictment related to the [extraneous offense]" as "there was insufficient evidence to support [C.R.'s] allegations." Appellant also argues that the trial court erred in admitting C.R.'s testimony because "any probative value was outweighed by the danger of unfair prejudice."

A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). A trial court abuses its

---

[13] *See Pete v. State*, Nos. 05-18-00573-CR to 05-18-00575-CR, 2018 WL 3062507, at *1 (Tex. App.—Dallas June 21, 2018, no pet.) (mem. op., not designated for publication) (explaining appellant was convicted of three separate felony offenses of aggravated sexual assault of a child, and on November 15, 2017, trial court assessed his punishment at confinement for eight years for each offense); *see also Ex parte Pete*, 517 S.W.3d 825, 827 (Tex. Crim. App. 2017) (explaining jury found appellant guilty of three separate felony offenses of aggravated sexual assault of child, but during punishment phase of trial, appellant requested mistrial, which the trial court granted only as to punishment phase of trial; appellant then filed pretrial application for writ of habeas corpus before new punishment hearing commenced and after appeals were complete, Texas Court of Criminal Appeals remanded case to trial court to conduct new punishment hearing).

22

discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court's decision to admit evidence will be upheld if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018); *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). A trial court's ruling on the admission of extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling, even if the trial court gives the wrong reason for the right ruling. *Id.*

"An extraneous offense is any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (internal quotations omitted). Generally, Texas Rule of Evidence 404(b) prohibits the admission of extraneous offense evidence to prove a person's character or to show that the person acted in

conformity with that character. *See* TEX. R. EVID. 404(b). But when a defendant is being prosecuted for the offense of aggravated sexual assault of a child, evidence that the defendant has committed one or more of the enumerated sexual offenses against a child, including the offense of indecency with a child, sexual assault of a child, or aggravated sexual assault of a child,[14] "may be admitted . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE OF CRIM. PROC. ANN. art. 38.37, § 2; *see also Jeansonne v. State*, 624 S.W.3d 78, 94–95 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("Essentially, article 38.37 is an evidentiary rule applicable to certain types of sexual abuse cases . . . that supersedes the application of Texas Rule of Evidence 404(b), and makes admissible certain extraneous offense evidence that [r]ule 404(b) does not."); *Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (article 38.37, section 2(b) allows admission of evidence that defendant had previously committed certain sexual offenses against non-victims of charged offense).

Appellant first argues that the trial court erred in admitting, under Texas Code of Criminal Procedure article 38.37, C.R.'s testimony concerning extraneous

---

[14] *See Wishert v. State*, 654 S.W.3d 317, 330 (Tex. App.—Eastland 2022, pet. ref'd) ("Article 38.37, [s]ection 2(b) allows for the admission of evidence that the defendant has committed a separate offense of *a sexual nature against a child*; the 'child victim' of the separate offense need not be the victim of the offense for which the defendant is currently on trial.").

offenses committed by appellant because "C.R.'s testimony was not adequate to support a finding that [appellant] assaulted C.R. beyond a reasonable doubt."[15]

Before extraneous offense evidence may be admitted under Texas Code of Criminal Procedure article 38.37, the trial court must determine whether "the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2-a. "Adequate" under article 38.37, section 2-a means legally sufficient. *See Romano v. State*, 612 S.W.3d 151, 159 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (internal quotations omitted)). A complainant's testimony alone is sufficient to establish the offense of aggravated sexual assault of a child, sexual assault of a child, or indecency with a child beyond a reasonable doubt. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd); *see also Gutierrez v. State*, No. 01-19-00718-CR, 2021 WL 2931358, at *3 (Tex. App.—Houston [1st Dist.] July 13, 2021, pet. ref'd) (mem. op., not designated for publication).

---

[15] The State, in its briefing, asserts that appellant did not preserve his complaint under Texas Code of Criminal Procedure article 38.37 because appellant did not raise the complaint in the trial court. Due to our disposition of appellant's first issue, we need not address the State's preservation assertion. *See* TEX. R. APP. P. 47.1; *Cruz-Escalante v. State*, 491 S.W.3d 857, 860 n.3 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

At the article 38.37 hearing in the trial court, C.R. testified that she was born in June 1987. When she was eleven years old, appellant moved into her home. Appellant continued living with C.R. until the summer after her eighth-grade school year, right before C.R. turned fourteen years old.

C.R. further testified that when she was twelve years old, she and her friend came home after school one day. At the time, appellant was in his bed, and he called C.R. and her friend "to come in bed with him." C.R. and her friend "laid in bed with [appellant]." They gave him a hug. Appellant then "put [C.R.] on top of him," and C.R. could feel appellant's penis through his clothing.

Another time, when C.R. was twelve years old, she "woke up kind of feeling unusual." After appellant left for work, C.R. decided to talk to her mother. She told her mother that in a dream she had appellant "lifted [C.R.'s] leg and started . . . fondl[ing] [her] with his fingers." C.R. could not move and could not breathe. When C.R. awoke, she was the only person in her bed. She went to the bathroom, and her vagina was wet. C.R. told her mother that she was not sure "if it [had] really happen[ed] or if it was a dream." As soon as C.R. finished telling her mother about her dream, appellant appeared at the door. C.R.'s mother asked appellant if he had touched C.R., and appellant denied it.

C.R. also explained that a few days after the dream, appellant waited for C.R.'s mother to go to work and came and got C.R. out of her bedroom. Appellant

26

told C.R. that "he wanted to talk to [her] and . . . asked [her] [if she had] been sexual before because the way [that she had] described th[e] dream, a young lady who's never done anything before shouldn't get that wet." C.R. told appellant that she and her boyfriend had previously had sexual intercourse.[16]

Appellant then told C.R.'s mother that C.R. had sexual intercourse, and one night, C.R.'s mother and appellant brought C.R. into their bedroom. C.R.'s mother told her that she "wanted to look at [C.R.'s] private parts in front of [appellant]." C.R.'s mother looked at C.R.'s vagina and said that it "look[ed] normal." But a few days or weeks later, appellant told C.R. that he wanted to look at her vagina again. C.R. asked if they could call her mother, but appellant said no and that "he wanted to look at [her]." Appellant then made C.R. take down her underwear and used his thumbs to look at and touch her vagina. Appellant also licked C.R.'s vagina. Appellant next said, "Oh, God, why'd I do this? Why'd I do this?" But also told C.R. that "it looked like a grown man could fit in" her vagina. Appellant then put his penis inside C.R.'s vagina.[17]

After that incident, appellant putting his penis inside C.R.'s vagina became "a daily routine"; it happened multiple times before she turned fourteen years old. And

---

[16]   During the article 38.37 hearing, C.R. explained that when she was twelve years old, she was confused about what sexual intercourse was, so although she told appellant that she had sexual intercourse with her boyfriend, she had not actually had sexual intercourse before.

[17]   C.R. stated that she was twelve years old when this happened.

it continued happening while she was fourteen years old. Appellant also made C.R. put her mouth on his penis and touch his penis with her hand. C.R. was younger than fourteen years old when appellant made her put her mouth on his penis, and it happened more than one time. Appellant also put his mouth on C.R.'s vagina more than one time. Further, appellant touched C.R.'s breasts more than one time, and he put his finger in her anus once. Appellant threatened to put C.R.'s mother and brother "6 feet under" if C.R. told anyone about what was happening.

C.R. also testified that when she was fourteen years old and in the ninth grade, appellant came to get her at school during lunch time and "had [her] sexually" at his apartment. When appellant dropped C.R. back off at school, appellant made C.R. kiss him on the mouth. C.R.'s paternal grandfather happened to be nearby at the time and saw appellant kiss C.R. When C.R.'s grandfather asked her about what had happened, she told him that she had "endured . . . something that [she did not] want to talk about right [then]."

When she was sixteen years old, C.R. told her mother about appellant sexually abusing her, and they reported the abuse to law enforcement. Law enforcement officers investigated until the "investigator passed away." This caused C.R.'s case to get "lost in the system for a while."

At the article 38.37 hearing, C.R.'s testimony about the extraneous offenses committed against her by appellant was clear and unequivocal. And it was adequate

28

to support a finding that appellant had committed multiple sexual offenses against C.R., such as aggravated sexual assault of a child,[18] sexual assault of a child,[19] and indecency with a child,[20] beyond a reasonable doubt.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd) (testimony of child victim alone is sufficient to support conviction for sexual offense); *cf. Barrios v. State*, No. 13-22-00613-CR, 2024 WL 379521, at *8 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2024, no pet.) (mem. op., not designated for publication); *Martinez v. State*, No. 05-21-01032-CR, 2023 WL 4229542, at *3 (Tex. App.—Dallas June 28, 2023, pet. ref'd) (mem. op., not designated for publication) (evidence was sufficient to support finding that extraneous offense occurred beyond reasonable doubt where child witness testified that defendant committed sexual offense against her baby sister); *Romano*, 612 S.W.3d at 159 (holding child victim's testimony about extraneous offense adequate to support finding that defendant committed offense of indecency of child).

To support his assertion that "C.R.'s testimony was not adequate to support a finding that [appellant] assaulted C.R. beyond a reasonable doubt," appellant focuses not on C.R.'s testimony during the trial court's article 38.37 hearing, but on her

---

[18] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (2)(B).

[19] *See id.* § 22.011(a)(2).

[20] *See id.* § 21.11(a).

testimony before the jury in which she stated that the State ultimately decided not to prosecute appellant for the extraneous offenses she alleged he had committed against her because "there[] [was] not enough evidence." But the admission of extraneous offense evidence under Texas Code of Criminal Procedure article 38.37 does not require a defendant to have been charged with, tried for, or convicted of the extraneous offenses. *Castillo v. State*, 573 S.W.3d 869, 880–81 (Tex. App.— Houston [1st Dist.] 2019, pet. ref'd); *see also Miller v. State*, Nos. 05-22-01309-CR to 05-22-01312-CR, 2024 WL 322265, at *3 (Tex. App.—Dallas Jan. 29, 2024, no pet.) (mem. op., not designated for publication); *Berg v. State*, No. 01-22-00248-CR, 2023 WL 5616200, at *12 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. ref'd) (mem. op., not designated for publication); *Romano*, 612 S.W.3d at 159 (although jury did not indict defendant for extraneous offense, that did not render child victim's testimony inadequate under article 38.37). Instead, the fact that the State ultimately did not charge appellant for the offenses committed against C.R. goes to the weight of C.R.'s testimony, not to its admissibility. *Romano*, 612 S.W.3d at 159; *see also Bradshaw v. State*, 466 S.W.3d 875, 880 (Tex. App.—Texarkana 2015, pet. ref'd) (fact that grand jury did not indict defendant for extraneous offense was "of no consequence" to question of whether evidence of that offense was admissible under Texas Code of Criminal Procedure article 38.37).

Based on the foregoing, we conclude that the trial court properly determined that C.R.'s testimony about the extraneous offenses committed by appellant was adequate to support a finding by the jury that appellant committed the separate offenses beyond a reasonable doubt.

Appellant next argues that the trial court erred in admitting the testimony of C.R. because "any probative value was outweighed by the danger of unfair prejudice." *See* TEX. R. EVID. 403.

Even if extraneous offense evidence is admissible under Texas Code of Criminal Procedure article 38.37, a trial court has a nondiscretionary obligation to weigh the probative value of the evidence against any unfair prejudice of its admission when, as here, a defendant objects to the admission of extraneous offense evidence based on Texas Rule of Evidence 403. *Allen v. State*, 01-13-00784-CR, 2015 WL 5076288, at *9 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication); *Martines v. State*, 371 S.W.3d 232, 246–47 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When conducting a rule 403 analysis, a trial court must balance the probative force of and the proponent's need for the evidence against: (1) any tendency of the evidence to suggest decision on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the

likelihood that presentation of the evidence will amount to undue delay. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Gorman v. State*, No. 01-18-00316-CR, 2019 WL 610739, *5 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, no pet.) (mem. op., not designated for publication). A rule 403 analysis favors admissibility of relevant evidence, and a trial court's conclusion that the danger of unfair prejudice does not substantially outweigh the evidence's probative value is entitled to deference. *See Wilson v. State*, 473 S.W.3d 889, 900 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

Here, we will presume, without deciding, that the trial court erred in admitting C.R.'s testimony because, as appellant asserts, "any probative value was outweighed by the danger of unfair prejudice." But even if we make such a presumption, we must still perform a harm analysis to determine if the trial court's purported error requires reversal of the trial court's judgment. *See Petriciolet v. State*, 442 S.W.3d 643, 653–55 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (even if trial court improperly admitted evidence, appellate court must still determine whether defendant was harmed by erroneous admission).

The erroneous admission of evidence constitutes non-constitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b);

32

*Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *see also Motilla*, 78 S.W.3d at 355–60. And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Hankins v. State*, 180 S.W.3d 177, 182 (Tex. App.—Austin 2005, pet. ref'd).

Notably, in his briefing, appellant fails to conduct a harm analysis under Texas Rule of Appellate Procedure 44.2(b) to show that he was harmed by the admission of C.R.'s testimony at trial. *See, e.g.*, *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding defendant waived complaint on appeal because he inadequately briefed issue by failing to address whether alleged error was harmless); *Chaves v. State*, 630 S.W.3d 541, 556–58 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding defendant waived complaint trial court erred in admitting certain evidence because he "failed to adequately brief his assertion that he was harmed by the admission of" complained-of evidence); *Wilson*, 473 S.W.3d at 900–01 ("Here, we do not address whether the trial court erred in admitting the complained-of extraneous-offense evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission.").

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008); *Chaves*, 630 S.W.3d at 555, 557–58.

As the Texas Court of Criminal Appeals has emphasized, an appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for an appellant. *See Wolfe v. State*, 509 S.W.3d 325, 342–43 (Tex. Crim. App. 2017); *Busby*, 253 S.W.3d at 673; *see also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make appellant's arguments for him . . . .").

Although in his briefing, appellant argues that the trial court erred in admitting C.R.'s testimony because "any probative value was outweighed by the danger of unfair prejudice," his brief contains no argument, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the evidence. *See Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . ."); *see also Wilson v. State*, No. 01-22-00361-CR, 2024 WL 86505, at *7–11 (Tex. App.—Houston [1st Dist.] Jan. 9, 2024, pet. ref'd) (mem. op., not designated for publication) (although appellant argued that trial court erred in admitting certain testimony, holding complaint waived because appellant's brief contained no argument, substantive analysis, or citation to authorities to show that he was harmed by purported erroneous admission of testimony). Thus, we conclude that appellant waived, due to inadequate briefing, his complaint that the trial court erred in admitting C.R.'s testimony about extraneous offenses because "any probative value was outweighed by the danger of unfair prejudice." *See, e.g.*,

35

*Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Wilson*, 2024 WL 86505, at \*7–11 (holding appellant waived, due to inadequate briefing, his complaint that trial court erred in admitting certain testimony in violation of the Texas Rules of Evidence); *Chaves*, 630 S.W.3d at 557–58 (holding defendant waived complaint trial court erred in admitting certain evidence because appellant's brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the [complained-of evidence]"); *Wilson*, 473 S.W.3d at 900–01 (defendant waived complaint trial court erred in admitting extraneous offense evidence where he failed to "identify[] the harm that he suffered as a result of the admission of the complained-of evidence").

Based on the foregoing, we hold that the trial court did not err in admitting into evidence C.R.'s testimony about certain extraneous offenses committed by appellant.

We overrule appellant's first issue.

**Motion for New Trial Hearing**

In his second issue, appellant argues that the trial court erred in not granting him a hearing on his motion for new trial because appellant "raised a claim [in his motion] that the trial court abused its discretion in admitting C.R.'s testimony when

[the State] had not sought an indictment and when no additional evidence was presented at . . . trial beyond what was known by the . . . prosecutors who declined charges."

A defendant in a criminal case "may file a motion for new trial before, but not later than [thirty] days after, the date when the trial court imposes or suspends sentence in open court." TEX. R. APP. P. 21.4(a). But a defendant does not have an absolute right to a hearing on the motion. *Washington v. State*, 394 S.W.3d 39, 42 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). The purpose of a hearing on a motion for new trial is (1) to determine whether the case should be retried or (2) to complete the record for presenting issues on appeal. *Id.*

A hearing on a motion for new trial is not required when the matters raised in the motion are subject to being determined from the record. *Smith v. State*, 286 S.W.3d 333, 338 (Tex. Crim. App. 2009). Conversely, a trial court abuses its discretion in failing to hold a hearing on a motion for new trial when that motion raises matters which are not determinable from the record. *Id.* But, while recognizing that an unrestricted requirement of a hearing on matters not determinable from the record could lead to "fishing expeditions," the Texas Court of Criminal Appeals has also held that even a defendant who has raised such matters is not entitled to a hearing on his motion for new trial unless he establishes the existence of reasonable grounds showing that he could be entitled to relief. *Id.* at

339 (internal quotations omitted). Thus, as a prerequisite to a hearing when the grounds in the motion are based on matters not already in the record, the motion must be supported by an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim. *Id.* The affidavit need not establish a prima facie case, or even reflect every component legally required to establish relief. *Id.* It is sufficient if a fair reading of it gives rise to reasonable grounds in support of the claim. *Id.* But affidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, in that circumstance, no hearing is required. *Id.*

We review a trial court's decision to deny a hearing on a motion for new trial for an abuse of discretion. *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010). We will reverse "only when the trial [court]'s decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id.* (internal quotations omitted). Our review is limited to the trial court's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable, meaning they could entitle the defendant to relief. *Smith*, 286 S.W.3d at 340. This is because the trial court's discretion extends only to deciding whether these two requirements are satisfied. *Id.* If the trial court finds that the defendant has met the criteria, the trial court has no discretion to withhold a hearing. *Id.*

Although appellant filed a motion for new trial, no affidavit accompanied his motion. An accompanying affidavit is "an absolute prerequisite to obtain[] a hearing" on a motion for new trial, and a trial court does not abuse its discretion if it denies a hearing on a timely motion for new trial that is not supported by an affidavit. *Cooksey v. State*, No. 07-21-00191-CR, 2022 WL 1012757, at *1 (Tex. App.—Amarillo, Apr. 1, 2022, no pet.) (mem. op., not designated for publication) (internal quotations omitted); *Medina v. State*, No. 05-19-01116-CR, 2021 WL 247965, at *1 (Tex. App.—Dallas Jan. 26, 2021, pet. ref'd) (mem. op., not designated for publication); *see also Smith*, 286 S.W.3d at 339 (as prerequisite for hearing when grounds in motion for new trial are based on matters not already in record, motion must be supported by affidavit, either of defendant or someone else, specifically setting out factual basis for claim); *Brooks v. State*, No. 12-22-00174-CR, 2023 WL 4898652, at *2 (Tex. App.—Tyler July 31, 2023, no pet.) (mem. op., not designated for publication); *Crowell v. State*, 642 S.W.3d 885, 889 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd).

We note that instead of an affidavit, appellant attached to his motion for new trial a verification signed by his appointed appellate counsel. That verification stated:

> My name is [appointed appellate counsel]. I am an attorney licensed to practice law in Texas, and counsel of record for [appellant] in connection with his motion for new trial. I have read the foregoing motion for new trial, pertinent portions of the District Clerk's file,

discovery available on the District Attorney's Portal, and pertinent portions of that transcripts from [appellant's] previous trials. I have spoken at length with [appellant] (who represented himself at trial) and with [appellant's] standby trial counsel about the case.

I state under oath that the factual assertions in this motion for new trial, and of which I have personal knowledge, are true and correct, and which under controlling case law are clearly sufficient to entitle [appellant] to an evidentiary hearing on the allegations in this motion.

Texas Civil Practice and Remedies Code section 132.001 allows a criminal defendant to attach an unsworn declaration in lieu of an affidavit to his motion for new trial.[21] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 132.001(a); *see also Dominguez v. State*, 441 S.W.3d 652, 657–58 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (explaining unsworn declaration provision found in Texas Civil Practice and Remedies Code applied to permit use of unsworn declaration in support of criminal defendant's motion for new trial); *Owens v. State*, 763 S.W.2d 489, 490–91 (Tex. App.—Dallas 1988, pet. ref'd). But the unsworn declaration must still set out the factual basis of the claim asserted in the motion for new trial and show reasonable grounds for relief. *See Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009); *see also Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994) (affidavit attached to motion for new trial deficient where it did not "show[] reasonable grounds").

---

[21] Any person may satisfy the legal requirement of an affidavit with an unsworn declaration. *Dominguez v. State*, 441 S.W.3d 652, 657–58 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

Notably, a verification from a criminal defendant's counsel simply stating that counsel had prepared the defendant's motion for new trial, counsel had personal knowledge of the facts presented in the motion, and the facts were true and correct has been held to be insufficient to show reasonable grounds for relief. *See Alcott v. State*, 26 S.W.3d 1, 4–5 (Tex. App.—Waco 1999), *aff'd*, 51 S.W.3d 596 (Tex. Crim. App. 2001); *see also Hobbs*, 298 S.W.3d at 200 n.32 (explaining where verification attached to motion for new trial was from defendant's counsel, who could not have personal knowledge "of all of the facts alleged in the motion," verification was insufficient); *Martin v. State*, Nos. 02-10-00230-CR to 02-10-00233-CR, 2011 WL 3546619, at *3 n.5 (Tex. App.—Fort Worth Aug. 11, 2011, no pet.) (mem. op., not designated for publication); *Suarez v. State*, No. 14-10-00100-CR, 2011 WL 1662845, at *3 & n.1 (Tex. App.—Houston [14th Dist.] May 3, 2011, no pet.) (mem. op., not designated for publication) (verification by defendant's counsel stating allegations in new-trial motion were true and correct was conclusory and insufficient to require hearing); *Martinez v. State*, No. 01-06-00976-CR, 2008 WL 44373, at *3–4 (Tex. App.—Houston [1st Dist.] Jan. 3, 2008, pet. ref'd) (mem. op., not designated for publication) (where only defendant's appellate counsel provided verification reciting she had reviewed new-trial motion and facts contained therein were true and correct, trial court did not err in failing to hold new-trial hearing); *Shelton v. State*, Nos. 11-01-00056-CR, 11-01-00057-CR, 2002 WL 32341865, at *5 (Tex. App.—

41

Eastland July 25, 2002, no pet.) (not designated for publication) (verification signed by defendant's counsel and attached to new-trial motion insufficient to support motion). Here, appellant's appointed appellate counsel's verification, which was attached to appellant's motion for new trial, was insufficient to put the trial court on notice that reasonable grounds for relief existed, and thus, a hearing on appellant's motion was not mandatory.

Further, as noted above, to be entitled to a hearing on his motion for new trial, appellant was required to establish the existence of reasonable grounds showing that he could be entitled to relief. In his motion for new trial, appellant argued that he was entitled to a new trial because the trial court erred in admitting C.R.'s testimony about extraneous offenses under Texas Code of Criminal Procedure article 38.37 because the district attorney's office which investigated C.R.'s allegations against appellant "found that the evidence was not sufficient to bring to trial" and the State "fail[ed] to develop and present additional evidence supporting C.R.'s allegation[s]."

On appeal, we have addressed this complaint by appellant and concluded that the trial court properly determined that C.R.'s testimony about the extraneous offenses committed by appellant was adequate to support a finding by the jury that appellant committed the separate offenses beyond a reasonable doubt. And the trial court did not err by admitting C.R.'s testimony pursuant to Texas Code of Criminal Procedure article 38.37. Thus, we cannot say that appellant's motion for new trial

42

established reasonable grounds showing that he could potentially be entitled to relief, and he was not entitled to a hearing on his motion for new trial. *See Rodriguez v. State*, No. 01-22-00295-CR, 2023 WL 8262839, at *15 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.) (mem. op., not designated for publication); *Chapa v. State*, 407 S.W.3d 428, 434–35 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("Because none of appellant's allegations were sufficient to require the trial court to hold a hearing on the motion for new trial, the trial court did not abuse its discretion in refusing to hold a hearing.").

Based on the foregoing, we hold that the trial court did not err in not holding a hearing on appellant's motion for new trial.

We overrule appellant's second issue.

## Mistrial

In his third issue, appellant argues that the trial court erred in declaring a mistrial during his first trial and double jeopardy barred appellant's subsequent prosecution for two felony offenses of aggravated sexual assault of a child because "the mistrial was not justified" and appellant was improperly led to consent to a mistrial.[22]

---

[22] The State, in its briefing, asserts that appellant did not preserve his complaint that the trial court erred in granting a mistrial in his first trial and double jeopardy barred his subsequent prosecution for two felony offenses of aggravated sexual assault of a child related to the complainant. Due to our disposition of appellant's third issue,

We review a trial court's decision to grant a motion for mistrial for an abuse of discretion. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *State v. Doyle*, 140 S.W.3d 890, 893–94 (Tex. App.—Corpus Christi–Edinburg 2004, pet. ref'd). A trial court does not abuse its discretion when its decision is at least within the zone of reasonable disagreement. *Montgomery*, 810 S.W.2d at 391.

Initially, a Harris County grand jury returned a true bill of indictment, alleging that appellant, on or about May 1, 2014 through on or about April 19, 2015, "did then and there unlawfully, during a period of time of thirty or more days in duration, commit at least two acts of sexual abuse against a child younger than fourteen years of age, including an act constituting the offense of aggravated sexual assault of a child, committed against [the complainant] on or about May 1, 2014, and an act constituting the offense of aggravated sexual assault of a child, committed against [the complainant] on or about April 1, 2015, and [appellant] was at least seventeen years of age at the time of the commission of each of those acts." *See* TEX. PENAL CODE ANN. § 21.02(b) (offense of continuous sexual abuse of young child). In November 2021, a jury trial was held. At the conclusion of the guilt phase of trial, the trial court read the charge to the jury. After the jury deliberated and reached a verdict, but before the trial court read the verdict aloud, the trial court noticed that

---

we need not address the State's preservation assertion. *See* TEX. R. APP. P. 47.1; *Cruz-Escalante*, 491 S.W.3d at 860 n.3.

the copy of the jury charge that the jury used in its deliberation "contain[ed] the wrong instructions" concerning the lesser included offense of aggravated sexual assault of a child.

At that point, the trial court held a hearing outside the presence of the jury. During the hearing, the jury foreman explained that the jury considered in its deliberations the jury charge that contained the incorrect instruction for the lesser included offense of aggravated sexual assault of a child. The State then expressed certain options that it believed the trial court could take in light of what had happened: (1) the trial court could declare a mistrial; (2) the trial court could provide the jury with the correct jury charge and ask the jury to redeliberate relying on the correct jury charge; or (3) the trial court could "move forward with th[e] verdict" despite the incorrect instructions. The State did not request a mistrial and stated that it would "like to move forward with th[e] verdict" as is. Appellant, however, stated that he would "have no problem with [the trial court] declaring a mistrial" and specifically asked the trial court "to declare this a mistrial." And in response to the State's request to "move forward," appellant objected and again requested a mistrial. The trial court granted appellant's request for a mistrial after finding that "the jury charge that the jury reviewed ha[d] the wrong language on the application paragraph" related to the lesser included offense of aggravated sexual assault of a child.

"The Fifth Amendment to the United States Constitution prohibits a [s]tate from twice putting a defendant in jeopardy for the same offense." *Ex parte Brown*, 907 S.W.2d 835, 838 (Tex. Crim. App. 1995). Jeopardy attaches once a jury has been impaneled and sworn. *Id.* at 839. "Consequently, as a general rule, if, after the defendant is placed in jeopardy, the jury is discharged without reaching a verdict, double jeopardy will bar retrial." *Id.*; *see also Ex parte Herrington*, 643 S.W.3d 255, 258 (Tex. App.—Tyler 2022, no pet.) ("[T]he premature termination of a criminal prosecution via the declaration of a mistrial, if it is against the defendant's wishes, ordinarily bars further prosecution for the same offense.").

However, when a defendant consents to a mistrial, double jeopardy does not bar his retrial. *See Harrison v. State*, 767 S.W.2d 803, 806 (Tex. Crim. App. 1989); *Sullivan v. State*, 874 S.W.2d 699, 701 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (double-jeopardy protections do not prohibit new trial following mistrial where defendant requested mistrial); *see also United States v. Scott*, 437 U.S. 82, 93 (1978) (noting defendant's motion for mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact" and "the Double Jeopardy Clause is not offended by a second prosecution" when "a defendant successfully" pursues "a motion for mistrial" (emphasis omitted)). Instead, a retrial is generally permitted because the defendant himself elected to terminate the proceedings and to begin anew. *See Harrison*, 767

S.W.2d at 806; *see also Ex parte Jackson*, Nos., 09-14-00138-CR to 09-14-00140-CR, 2014 WL 3845780, at *1–3 (Tex. App.—Beaumont Aug. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (defendant impliedly consents to mistrial if he does not object to the trial court's sua sponte declaration of mistrial, despite adequate opportunity to do so).

On appeal, appellant asserts that the State led him to believe that he had no other option other than to request a mistrial. But, as the Texas Court of Criminal Appeals has explained, "[o]nly when the prosecutor intends to provoke the defendant's mistrial motion can it be said that the prosecutor, rather than the defendant, . . . exercised primary control over the decision to seek the trial['s] termination." *Ex parte Lewis*, 219 S.W.3d 335, 358–59, 371 (Tex. Crim. App. 2007). Here, the State specifically stated that it was "not asking for a mistrial" and explained at the hearing that, based on case law, it "would like to move forward with th[e] verdict" despite the incorrect instructions included in the jury charge.

In contrast, appellant specifically requested that the trial court declare a mistrial more than once during the hearing in which the parties and the trial court discussed what to do in light of the incorrect instructions included in the jury charge. *See Torres v. State*, 614 S.W.2d 436, 441–42 (Tex. Crim. App. [Panel Op.] 1981) (consent to mistrial can be expressed or implied "from the totality of circumstances attendant to a declaration of mistrial"); *see also Whitley v. State*, No.

05-91-00547-CR, 1992 WL 76546, at *1 (Tex. App.—Dallas Mar. 31, 1992, no pet.) (not designated for publication) (concluding defendant expressly consented to mistrial where State moved for mistrial and defendant stated, "We're going to go along with the mistrial" (internal quotations omitted)). Because appellant requested that the trial court grant a mistrial in his first trial, we hold that the trial court did not err in granting the mistrial and double jeopardy did not bar appellant's prosecution for the two felony offenses of aggravated sexual assault of a child in the underlying trial court cases.

We overrule appellant's third issue.

## Conclusion

We affirm the judgments of the trial court. We dismiss any remaining pending motions as moot.

Julie Countiss
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).